[Civ. No. 12249. First Dist., Div. One. Apr. 30, 1943.]

JAMES T. GILLETTE, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

John J. O'Toole, City Attorney, Henry Heidelberg, Deputy City Attorney, and A. Dal Thomson for Appellants.

Timothy Healy, Linforth, Cannon & Miller, Jesse H. Miller and Cyril Appel for Respondent.

KNIGHT, J.—The defendants appeal from a judgment for plaintiff entered pursuant to the verdict of a jury in an action to recover damages for personal injuries of a permanent character sustained by plaintiff as the result of being struck by a street car of the Municipal Railway, operated by the defendant city. The motorman was joined as party defendant, and one of the defenses urged was contributory negligence. At a previous trial a jury returned a verdict for the defendants; plaintiff appealed, and the judgment was reversed for the giving of erroneous instructions. The court held that while it could be claimed that plaintiff was guilty of contributory negligence, it was equally clear that he contended at all times that his acts were not a proximate cause of the accident and that the doctrine of the last clear chance was applicable; that the evidence was sharply conflicting, and that the instructions as given "took from the jury the consideration of those contentions" and were therefore prejudicially erroneous. (*Gillette* v. *San Francisco*, 41 Cal.App.2d 758 [107 P.2d 627].) As in the previous trial the jury here

was instructed on the last clear chance doctrine, and no complaint is made by defendants that singly or as a whole said instructions do not correctly state the law, but it is contended that the evidence was such as to preclude a right of recovery under the last clear chance doctrine, and that therefore the giving of any instructions pertaining to that doctrine calls for a reversal of the judgment.

Plaintiff at the time of the accident was a motorman employed by the Market Street Railway Company on one of its street cars which had become temporarily stalled on lower Market Street, and he was struck by a passing Municipal Railway car traveling in the same direction, easterly, toward the ferry, on a parallel track; but there is a conflict in the evidence as to plaintiff's position at the time he was struck. Plaintiff's witnesses testified that he was standing in the street in plain view between the tracks; whereas defendants' case was tried on the theory that he was not standing in the street at all; that he swung out from the platform of the Market Street Railway car while the municipal car was passing and was struck by some part of the municipal car back of the front corner thereof.

The evidence being in sharp conflict, and the jury having decided in plaintiff's favor, the testimony supporting plaintiff's case must be taken as true for the purpose of this appeal. The essential facts may therefore be stated as follows: The accident occurred about 7:15 p. m. on August 10, 1935 (while it was still daylight), on Market Street within the block east of Second Street. There are four sets of parallel car tracks on Market Street, the inner two being used by the Market Street Railway, and the outer two by the Municipal Railway. The distance between the northerly rail of the Municipal eastbound track and the southerly rail of the Market Street Railway eastbound track is six feet. The overhang of the cars involved herein totalled 3 feet 9 inches, leaving a clearance between the cars of 27 inches. There is a switchback between the east and westbound Market Street Railway tracks, the east end of which was 228 feet east of Second Street. At the time the accident herein occurred, an eastbound No. 7 car of the Market Street Railway had stopped east of the switchback in order to turn back and proceed in the opposite direction. A No. 5 eastbound car (headed toward the ferry) stopped just west of the switchback, a No. 21 stopped behind the No. 5, and a No. 31 stopped back of the No. 21, all waiting for the No. 7 to take the westbound track.

The three stalled cars were all 50 feet long, and stopped with a space of 5 feet between each other, so that the rear platform of the last car was about even with the east property line of Second Street. Plaintiff was the motorman on the No. 21 (which was as stated between the No. 5 and the No. 31), and after the Market Street Railway cars had come to a stop he leaned out of his car and said something to the conductor of the No. 5, named Kitto. He then got out of his car and went forward to talk to Kitto. Upon reaching the rear platform of the No. 5 car he stood on the street about a foot away from the car, with his right hand on the middle stanchion of the rear platform of the No. 5. It was stipulated that his body was about a foot in thickness; and according to Kitto, plaintiff stood "kind of sideways" with his back toward the west, up Market Street, looking up at Kitto. He conversed with Kitto some 10 or 15 seconds about being delayed, and while standing in that position, a "C" car of the Municipal Railway, operated by the defendant Godfrey, came along on the outer track, struck plaintiff, and he was thrown beneath the rear truck of the "C", his leg being pinned under the front wheel of the rear truck. As a result of the accident plaintiff suffered severe head injuries, including complete loss of hearing in one ear and a defect in vision, and the loss of his left leg below the knee. Because of his injuries he was unable to recollect anything connected with the accident.

Kitto testified that the "C" car was traveling 25 to 30 miles an hour when it struck plaintiff; that it gave no warning of its approach, nor did he hear it approaching; that plaintiff was struck by the front left hand corner of the car, and that it did not stop until the rear end was 5 or 10 feet beyond the front fender of the No. 5. He also testified that plaintiff did not move while he stood on the street talking to him, and that he had been standing there 10 or 15 seconds when he was struck.

Bernstein, the conductor of the No. 31, was looking out the right side of his car, toward the ferry, and saw plaintiff standing on the street facing the rear platform of the No. 5, and he saw the "C" come alongside and strike plaintiff. He, like Kitto, testified that plaintiff did not move; that the "C" gave no warning of its approach; that plaintiff was struck by the left corner of the "C", and that the "C" did not stop until the rear end was about 10 feet ahead of the front of the No. 5.

Dr. Wilson, a dentist residing in Niles, was riding as a passenger on the rear end of the No. 5, and he testified substantially the same as the two above-mentioned employees. He saw the conductor of his car lean out and talk to the motorman of the car behind (plaintiff). He then saw plaintiff standing on the street directly below the conductor of the No. 5, conversing with the conductor, for several seconds; he saw the "C" car momentarily before the impact, coming down the outside track, but testified that it gave no warning of its approach; that plaintiff was struck by the left front stanchion of the car; that the "C" stopped with its rear end some 5 or 6 feet ahead of the front of the No. 5; that the accident happened so suddenly and without warning that he did not realize plaintiff was going to be struck and could give no warning of the car's approach.

The motormen of the No. 5, the No. 31, and the conductor of the No. 21 did not see plaintiff struck, but all of them estimated the speed of the "C" at between 20 and 30 miles an hour, and testified that it gave no warning of its approach, and that it stopped some 5 or 10 feet ahead of the front of the No. 5.

The motorman of the "C" car testified among other things that it was daylight and his vision was good; that he could see ahead down the track all the way from Second Street to the Ferry Building; that he was looking straight ahead, "along the side of the cars that were standing still"; that as he approached Second Street he rang the bell and made a "check stop" by slowing down and then going ahead, because he saw "carmen standing out alongside of their cars like carmen always do," and that he saw people getting off the No. 7 car. But he denied having seen plaintiff at any time. In this regard he stated that the first thing that happened that indicated to him that there might have been an accident was that he "heard a crack" and "saw a dark object like a hat flying in the air," and that he then applied the brakes and stopped the car. In this connection it should be noted that no one else testified that any carmen other than plaintiff were standing alongside their cars. Quite to the contrary, all the other motormen and conductors of the stalled cars testified positively that they were on the respective platforms of their cars when the accident occurred.

The evidence relied upon by defendants as showing that plaintiff swung out from the front platform of the No. 21

car of the Market Street Railway as the municipal car was passing consisted of the testimony given by a taxi-cab driver who was traveling down Market Street about 75 feet to the rear of the Municipal car, and a broken grab handle on the car. But at the most, such evidence raised only a conflict with that produced by plaintiff. There was also a conflict in the evidence relating to the speed of the municipal car and as to the distance it traveled before it was finally brought to a stop. But in view of the well settled rule that all conflicts must be resolved in favor of the prevailing party, it becomes unnecessary to narrate the opposing testimony in greater detail.

 Counsel for plaintiff concede that plaintiff was negligent in standing on the street between the tracks in a position where he might be struck by a passing car; but it is contended that since the evidence shows that plaintiff was standing in a position of danger, with his back toward and unaware of the peril of the approaching car and in plain view of the motorman of that car, the inference may be fairly drawn that the motorman must have seen plaintiff and could have avoided the accident by simply sounding his bell as a warning of his approach or applying the brakes and stopping his car, and that therefore his negligence in failing to do either was the proximate cause of the accident, which brought into operation the doctrine of the last clear chance. We are of the opinion that the law as laid down by such cases as *Girdner* v. *Union Oil Co.*, 216 Cal. 197 [13 P.2d 915]; *Center* v. *Yellow Cab Co.*, 216 Cal. 205 [13 P.2d 918]; *Darling* v. *Pacific Electric Ry. Co.*, 197 Cal. 702 [242 P. 703]; *Wahlgren* v. *Market Street Ry. Co.*, 132 Cal. 656 [62 P. 308, 64 P. 993]; and *Hoy* v. *Tornich*, 199 Cal. 545 [250 P. 565], fully supports plaintiff's contention and that therefore the trial court was justified in submitting that issue to the jury under the instructions given.

 Defendants contend that plaintiff's negligence constituted contributory negligence as a matter of law, which was concurrent with the asserted negligence of the defendants in the operation of their car, and continued up to the very time of the accident, and that therefore there is no room for the application of the doctrine of last clear chance. In other words, defendants contend that plaintiff by moving a step forward could have avoided being struck; hence that he not only had a better chance of avoiding the accident, but that

his negligence continued up to the moment he was struck and was the proximate cause of the accident; and that therefore the doctrine of last clear chance should not have been submitted to the jury. There is no merit in the contention. The case of *Girdner* v. *Union Oil Co., supra,* is recognized generally as the leading late authority on the doctrine of last clear chance, and in discussing the question of continuing negligence the court there said in part: "It is claimed on behalf of appellants that the doctrine of last clear chance has no application to a situation as here, where by mutual carelessness an injury ensues to one of two parties. In other words, the doctrine of last clear chance excludes from the operation of its underlying principle every case wherein it may be said that the negligence of the injured party was contemporaneous, concurrent, continuing and contributory with the negligence of the party inflicting the injury, up to the very moment of the impact. . . . The real issue in cases of the character here involved is not whose negligence came first or last, but whose negligence, however it came, was the proximate cause of the injury. (*Esrey* v. *Southern Pac. Co.,* 103 Cal. 541 [37 P. 500] ; Beach on Contributory Negligence, sec. 50.) Whether or not, therefore, negligence is the proximate or remote cause is, as above stated, a question of fact in each particular case. The doctrine of continuing negligence has no application unless the negligence is the proximate cause of the injury. On the other hand, if all the elements of the last clear chance doctrine are present and plaintiff's negligence becomes remote in causation, then this doctrine applies. If any one of the elements of the last clear chance doctrine is absent, then plaintiff's negligence remains the proximate cause and bars recovery. But the continuous negligence rule does not apply to a situation in which the last clear chance rule, by the presence of its own elements, is brought into operation. . . . The element of continual negligence is present in all last-chance cases. If defendant is not able to avoid injuring plaintiff in the exercise of ordinary care, the plaintiff's original negligence continues to be the proximate cause of his own injury, which bars recovery. If, on the other hand, defendant is able to avoid injuring the negligent plaintiff, and negligently fails to do so, plaintiff's original though continuing negligence only remotely contributes to the injury and is not the proximate cause thereof, and hence the applied doctrine, by its own principles, establishes the right of plaintiff to

recover notwithstanding the fact that his original negligence would, by its continuing nature, bar a recovery if the doctrine were not applicable. To hold otherwise would be to dispute its existence. The real question to be determined in considering cases of the character of the one here involved is whether or not the so-called continuing negligence is the proximate or remote cause of the injury, which question is determined by the application of the principles of the doctrine of the last clear chance itself. Stated in another way, contributory negligence of the party injured is not the proximate cause of the injury, as the negligence of the defendant being later it constitutes the sole proximate cause. (*Cady* v. *Sanford,* 57 Cal.App. 218 [207 P. 45].) When the doctrine applies, plaintiff's negligence becomes remote rather than proximate in causation. If it does not apply, his negligence remains proximate in its causation and will bar his recovery.''

From the foregoing it will be seen that the continuous negligence rule does not operate to the exclusion of the last clear chance doctrine when all of the elements of that doctrine are present; and this is such a case. ■ As set forth in the Girdner case, *supra,* those elements are as follows: ''That plaintiff has been negligent and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape; that defendant has knowledge that the plaintiff is in such a situation, and knows, or in the exercise of ordinary care should know, that plaintiff cannot escape from such situation, and has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure.'' As stated, plaintiff's negligence is conceded. As to the second element, it will be noted that the term ''danger from which he cannot escape by the exercise of ordinary care'' includes ''cases where he is totally unaware of his danger and for that reason unable to escape''; and here the actual danger of which plaintiff was unaware was the approach of the munipal car at an excessive rate of speed without giving any warning of its approach; and being totally unaware of such danger he was, for that reason, unable to escape therefrom. Defendants argue that plaintiff being a motorman must have been

aware of the possibility of a car coming along on the outer track and striking him, and that if he was standing in the pathway of the car he could have taken a step forward and avoided being struck. There would be much force in the argument if any warning had been given of the approach of the municipal car; but the fact that plaintiff did not take a step forward and thus avoid being struck was sufficient to warrant the conclusion that he was totally oblivious to the danger, because, obviously, it cannot be said that any reasonable person, being aware of an oncoming street car, would stand motionless in its pathway and be struck thereby. As said in the Girdner case, *supra*, a plaintiff is not required to show that his inability to escape from the threatened danger was a physical impossibility. The doctrine applies equally if he is wholly unaware of his danger, and for that reason is unable to escape. (See also *Darling* v. *Pacific Electric Ry. Co., supra; Palmer* v. *Tschudy*, 191 Cal. 696 [218 P. 36].) Nor where a defendant has it within his power to prevent the injury is he relieved from liability because the injured person is unaware of his peril by reason of his own negligence. In this connection the court in the Girdner case goes on to say: "A defendant is never relieved of liability if he has it in his power to prevent the injury. This doctrine applies whether one is unaware of his peril by reason of his negligence, or when exercising ordinary care is so ignorant. In either situation the rule is the same. A defendant is not privileged to injure another simply because he is negligently or otherwise in a position of danger. If he has the opportunity of avoiding the injury, he must at his peril exercise it."

 With respect to the third element, the courts have held repeatedly that it is a question of fact for the jury to determine from all the circumstances presented by the evidence whether the defendant actually knew of the plaintiff's peril; and that notwithstanding there may be a total absence of any positive testimony that the defendant actually knew of plaintiff's danger, and even though the defendant definitely denies seeing the plaintiff at all, the doctrine of the last clear chance may be invoked and applied where the facts and circumstances are such as would justify the jury in finding that despite the defendant's denial of knowledge or the absence of direct testimony on the subject, he was actually aware of plaintiff's danger in time to avert the accident; in other words, that he "must have known" of plaintiff's danger. For

example, in the case of *Hoy* v. *Tornich, supra,* it was contended that since the uncontradicted evidence showed that the defendant did not see the plaintiff until the very moment of the accident, the doctrine of the last clear chance was inapplicable. The court held otherwise, saying: "If the defendant in this case was looking straight ahead, as he testified that he was, he must have seen the plaintiff." In another case "The motorman testified that he did not see plaintiff on the tracks until the car was within some 30 feet of the wagon, and that the horses were then upon the track"; and it was contended that there was "no other evidence in the record which would justify a contrary finding." But after reviewing the evidence the court held: "Under all the circumstances and conditions as disclosed by the record the jury might have found that the motorman saw plaintiff in time to have avoided the injury, and while plaintiff was actually in peril." (*Smith* v. *Los Angeles Ry.,* 105 Cal.App. 657 [288 P. 690], citing *Hoy* v. *Tornich, supra; Darling* v. *Pacific Electric Ry., Co., supra.*) Again, in the case of *Wahlgren* v. *Market Street Ry. Co., supra,* the court said : " As to the assumption of evidence in the instruction, we think counsel had a right to argue to the jury that the employes were interested witnesses, and though they both testified that they did not see plaintiff before her injury, yet, there being no obstruction to the view, the conductor must have seen her from where he was at the switch before the car passed him, if he was looking for approaching pedestrians, as his testimony would seem to imply." And in the case of *Paulos* v. *Market Street Ry. Co.,* 136 Cal.App. 163 [28 P.2d 94], the court used this language: "Even if the motorman had denied actual knowledge the jury could have disbelieved him and found, from the evidence, that he had such knowledge," citing *Hoy* v. *Tornich, supra; Darling* v. *Pacific Electric Ry. Co., supra; Chappell* v. *San Diego & Ariz. Ry. Co.,* 201 Cal. 560 [258 P. 73]. (For additional cases holding to the same effect, see 2 Cal.Jur. Ten-year Supp., pp. 189, 190.) In the present case the evidence shows, as above set forth, that plaintiff was standing motionless alongside the No. 5 car, directly in the pathway of and with his back toward the approaching municipal car; and Godfrey, the motorman of the municipal car, admitted he had a clear view of the tracks ahead, all the way from Second Street to the ferry, and that he was looking straight ahead "along the side of the cars that were standing still" and saw carmen "standing out alongside their cars like carmen always do."

In that state of the evidence, it was a pure question of fact for the jury to determine whether Godfrey, despite his denial, was actually aware of plaintiff's danger in time to avert the accident; and the jury having decided that question in favor of plaintiff, there was ample evidence to support the conclusion that Godfrey had the last clear chance to avert the accident by the exercise of ordinary care, to wit, by sounding his bell to give warning of the approach of his car, or by stopping the car before it reached the point where plaintiff was standing. In this latter respect Godfrey admitted that he saw the stalled cars when his car reached Second Street, which was more than 100 feet distant from the point of the accident, and that at all times thereafter he could have brought his car to a stop within 20 feet. And even though he may have believed that in the limited space between the two cars his car would clear plaintiff's body in safety, the defendants are not relieved from responsibility for the accident, for ''As held in a number of cases, where a person sees another in a position which is in fact dangerous, he may not rely upon dullness to excuse him from not realizing the danger of the position (*Basham* v. *Southern Pac. Co.*, 176 Cal. 320 [168 P. 359]); and if he sees the dangerous situation he must use reasonable diligence in analyzing the same (*Starck* v. *Pacific Electric Ry. Co.*, 172 Cal. 277 [L.R.A. 1916E, 58, 156 P. 51]), knowledge of danger being imputed where the circumstances are such as to convey to the mind of a reasonable man that the plaintiff is in a position of peril (*Harrington* v. *Los Angeles Ry. Co.*, 140 Cal. 514 [98 Am.St. Rep. 85, 63 L.R.A. 238, 74 P. 15]).'' (*Nicolai* v. *Pacific Electric Ry. Co.*, 92 Cal.App. 100 [267 P. 758]; *Paulos* v. *Market Street Ry. Co.*, *supra*.)

An examination of the cases cited and relied on by defendants in support of their position shows that they are not here controlling, for the reason that as pointed out in each of them there was an absence of some element essential to the proper application of the last clear chance doctrine. For instance, in those particularly relied on (*Palmer* v. *Tschudy*, *supra; Bagwill* v. *Pacific Electric Ry. Co.*, 90 Cal.App. 114 [265 P. 517]; *Young* v. *Southern Pac. Co.*, 189 Cal. 746 [210 P. 259]; *Rasmussen* v. *Fresno Traction Co.*, 15 Cal.App. 2d 356 [59 P.2d 617]), it appears that the plaintiffs while occupying positions of safety either saw or had warning of

the approach of the instrumentality which struck them, and that nevertheless by reason of their continuous negligence they placed themselves directly in the pathway thereof. And in *Poncino* v. *Reid-Murdock & Co.*, 136 Cal.App. 223 [28 P.2d 932], it was held that instructions on the last clear chance doctrine were properly refused for the reason that the evidence established as a matter of law that the defendant could not have averted the collision by the exercise of ordinary care and that therefore the conceded contributory negligence of the driver of the other automobile, who was killed in the accident, was the proximate cause of the collision.

In the present case, as shown, the evidence was legally sufficient to establish all of the elements necessary to justify the application of the doctrine of last clear chance; therefore it was proper for the court to submit the case to the jury under instructions on that doctrine. No other points being raised by the appeal, the judgment is affirmed.

Peters, P. J., and Ward, J., concur.

Appellants' petition for a hearing by the Supreme Court was denied June 28, 1943. Edmonds, J., voted for a hearing.