[Civ. No. 12816. First Dist., Div. One. Jan. 17, 1946.]

GINO PAOLINI, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation) et al., Appellants.

John J. O'Toole, City Attorney, and John F. Moran, Deputy City Attorney, for Appellants.

Charles V. Barfield and John J. Healy, Jr., for Respondent.

OGDEN, J. pro tem.—This is an action to recover damages for personal injuries sustained by plaintiff when struck by a streetcar operated by the defendant Schmidling, a motorman, in the course of his employment by the defendant city and county. The trial was had before a jury which rendered its verdict in plaintiff's favor in the amount of $20,000. Defendants' motion for a new trial was denied and judgment in the amount of the verdict was rendered, from which judgment defendants appeal.

The accident occurred shortly after 4:00 o'clock in the afternoon of May 24, 1943. Although the sky was overcast there was no low fog and visibility was good. Plaintiff was a plasterer in the employ of a contracting plasterer who had the plastering contract for a number of houses then under construction as a unit on the east side of 46th Avenue between Ulloa and Vicente Streets in San Francisco. Shortly before the accident, plaintiff had been driven to the site of this construction by the son of his employer in a truck, described as a Dodge express body type, having an enclosed cab in front and a flat bed in the rear which extended out beyond the sides of the driver's cab. The truck was parked in front of one of the houses under construction, on the east side of 46th Avenue facing south, or on the so-called "wrong" side of the street, and some distance out from the curb which was, at that point, obstructed by debris which extended somewhat into the street. The defendant municipality maintained double streetcar tracks on 46th Avenue at this location. The truck was so parked that the distance from its right side to the nearest streetcar rail was, as estimated by its driver, two or three feet. The clearance between the truck and the streetcar which later struck the plaintiff was estimated by the motorman as being about one and a half feet. The truck was so parked for five or ten minutes before the accident, during which time plaintiff and his driver were engaged in carrying tools from the truck to a shed at the rear of the house opposite which it was parked.

Plaintiff testified that after completing the removal of the tools which were to be left at that job, he had mounted the

running board of the truck on the side toward the car tracks, for the purpose of rearranging the remaining tools. He remained in that position, standing on the running board alongside the cab, facing north toward the rear of the truck and leaning over the front part of the truck bed arranging the tools therein, for a period of about two minutes, when he was struck by the streetcar coming from the south. He testified that the first indication he had of the approach of the streetcar was when he was struck; that when he came back to the truck he looked to see if any cars were coming but saw none; that he did not look around during the approximately two minutes that he was standing on the running board; that he did not hear any signal bell of the streetcar, and that there was much noise just before the accident from the building operations.

The motorman testified that when 20 feet past or north of the intersection of Vicente Street he first observed the truck and sounded the bell and immediately shut the power off, but did not apply the brakes; that he was then traveling about 25 miles per hour; that he was proceeding upon a slight upgrade and a reduction in speed to the extent of five miles per hour resulted; that he continued at this speed of approximately 20 miles per hour; that when the front of the streetcar was just about opposite the cab of the truck he first saw the plaintiff at the rear of the truck walking backward with his face toward the houses; that he then applied the air brakes as hard as possible and did not have time to do anything else; and that plaintiff continued to walk backwards until struck by the streetcar. With respect to sounding his bell, the motorman testified that when he saw the truck he sounded it; that he had done so in the preceding block to warn some children and continued to ring it on and off until he saw the truck, when he rang it more regularly, and that when he saw the plaintiff he rang it much faster.

The only other eyewitness to the impact, a passenger on the streetcar, testified that he first saw the plaintiff when the streetcar was about 20 feet from him and that plaintiff was standing on the street, motionless, right behind the cab of the truck, facing the cab. This witness and a Mrs. Friday, who lived a few doors from the scene of the accident, corroborated the motorman's testimony as to the sounding of the bell.

The driver of the truck, who was in the basement of one of the houses at the time of the accident, and a carpenter

foreman, who was about 300 feet away, testified that they did not hear any ringing of the bell. The latter testified that he saw the plaintiff immediately after the impact, spinning around in the air at least four feet off the ground, and that at that time the streetcar was traveling more than twenty-five miles per hour.

The evidence further disclosed that the second window from the front on the right side of the streetcar was shattered and broken. Since the lowest edge of this window was five feet five and one-half inches from the ground, this fact together with the testimony that plaintiff's body, immediately after the impact, was seen spinning in the air, lends support to plaintiff's testimony that he was in an elevated position at the time of the impact.

There was thus presented a sharp conflict in the evidence which was for the jury to determine. Its determination of this conflict in accordance with the version of the plaintiff was amply supported by the evidence, and we do not understand that defendants dispute this. Defendants do, however, urge several grounds for reversal which may be classified under three general headings,—first, that, assuming defendants' negligence, plaintiff is precluded from recovery because of his contributory negligence and the doctrine of the last clear chance is not applicable; second, that because of certain errors and misconduct occurring at the trial defendants were precluded from having a fair trial; and, third, that there was no evidence of permanency of injuries, and the amount of the verdict is excessive.

As to the first point, defendants contend that from the plaintiff's own testimony it must be concluded as a matter of law that he was guilty of contributory negligence. They urge that his conduct in voluntarily placing himself in such dangerous proximity to the path of the streetcar, with the realization that streetcars ran regularly thereon, and in remaining there without further observation, constituted negligence as a matter of law. Certainly such conduct would support a finding of negligence, but whether it would as a matter of law require it we are not called upon to decide, unless we hold that the doctrine of the last clear chance, which was embodied in the instructions to the jury, is not applicable to this case. That doctrine, if applicable, presupposes that such conduct of the plaintiff constituted negligence. (*Palmer v. Tschudy*, 191 Cal. 696 [218 P. 36].)

In dispute of the applicability of the doctrine of the

last clear chance, defendants urge two points,—first, that the evidence does not show that the motorman actually perceived the plaintiff and his peril in time to have avoided the accident; secondly, that the doctrine must be excluded because the negligence of the plaintiff was active and contemporaneous up to the very moment of his injury, and he had equal opportunity to avoid his injury by merely withdrawing his body to safety. These same contentions were unsuccessfully urged to this court by the defendant municipality in the case of *Gillette* v. *City of San Francisco*, 58 Cal.App.2d 434 [136 P.2d 611] (hearing in Supreme Court denied). The factual situation in that case, insofar as it pertains to both of these points, is sufficiently similar to the instant one as to render that decision determinative here. In that case the plaintiff, who was conceded to have been negligent in standing motionless directly in the pathway of an approaching streetcar, was struck by the latter from the rear. There, as here, the plaintiff if he had been aware of the approach of the car, could have readily removed himself to a place of safety. There, as here, there was no direct testimony that the motorman actually saw the plaintiff, although there was evidence that the motorman was looking straight ahead and had an uninterrupted view.

As to the actual knowledge of the motorman, the rule was stated in the Gillette case, *supra,* as follows (58 Cal.App. 2d p. 442): "the courts have held repeatedly that it is a question of fact for the jury to determine from all the circumstances presented by the evidence whether the defendant actually knew of the plaintiff's peril; and that notwithstanding there may be a total absence of any positive testimony that the defendant actually knew of plaintiff's danger, and even though the defendant definitely denies seeing the plaintiff at all, the doctrine of the last clear chance may be invoked and applied where the facts and circumstances are such as would justify the jury in finding that despite the defendant's denial of knowledge or the absence of direct testimony on the subject, he was actually aware of plaintiff's danger in time to avert the accident; in other words, that he 'must have known' of plaintiff's danger."

That this rule is equally applicable to the present case is apparent from the evidence. The motorman admitted that he saw the truck when he was 20 feet north of Vicente Street, or a distance of a little less than 200 feet from the

point of impact, and that there was nothing to affect his visibility. Plaintiff's position on the truck was an elevated one, in clear view of the motorman. It is a fair inference that when the motorman saw the truck he saw the plaintiff standing upon its running board, with his back to the approaching streetcar, and in such a position he would be struck unless he moved or the streetcar stopped. That the motorman knew, or should have known, that plaintiff was not aware of his peril, is an equally fair inference. Whether the motorman adequately sounded his bell was, upon the conflicting evidence, a question for the jury to determine. That he made no attempt to stop, or even slow the speed of his car to less than 20 miles per hour is admitted; that he could have stopped his car before reaching the truck is indicated by the fact that it was brought to a stop after the impact in a much shorter distance than the distance from which he had first observed the truck. The jury was entitled to determine that the motorman was actually aware of plaintiff's danger; that he knew, or should have known, that plaintiff was unaware of it and that he, the motorman, had the last clear opportunity to avoid the accident.

■ Defendants' contention that the doctrine must be excluded because of plaintiff's continuing negligence up to the moment of his injury is answered in the Gillette case, *supra,* quoting from *Girdner* v. *Union Oil Co.,* 216 Cal. 197 [13 P.2d 915]: " 'But the continuous negligence rule does not apply to a situation in which the last clear chance rule, by the presence of its own elements, is brought into operation. . . . The element of continual negligence is present in all last-chance cases. If defendant is not able to avoid injuring plaintiff in the exercise of ordinary care, the plaintiff's original negligence continues to be the proximate cause of his own injury, which bars recovery. If, on the other hand, defendant is able to avoid injuring the negligent plaintiff, and negligently fails to do so, plaintiff's original though continuing negligence only remotely contributes to the injury and is not the proximate cause thereof, and hence the applied doctrine, by its own principles, establishes the right of plaintiff to recover notwithstanding the fact that his original negligence would, by its continuing nature, bar a recovery if the doctrine were not applicable.' " (58 Cal.App.2d p. 440.)

■ As to the ability of respondent to escape from his predicament, in the Gillette case the rule is quoted from *Girdner* v. *Union Oil Co., supra*: "As set forth in the Gird-

ner case, *supra,* those elements [of the doctrine of the last clear chance] are as follows: 'That plaintiff has been negligent and, as a result thereof, is in a position of danger from which he cannot escape by the exercise of ordinary care; and this includes not only where it is physically impossible for him to escape, but also in cases where he is totally unaware of his danger and for that reason unable to escape; that defendant has knowledge that the plaintiff is in such a situation, and knows, or in the exercise of ordinary care should know, that plaintiff cannot escape from such situation, and has the last clear chance to avoid the accident by exercising ordinary care, and fails to exercise the same, and the accident results thereby, and plaintiff is injured as the proximate result of such failure.' '' (58 Cal.App.2d p. 441.)

The arguments of defendants upon the applicability of the doctrine of the last clear chance are so identical with those urged to this court in the Gillette case that it would be but repetition to further discuss them here. The authorities cited to us here are, in the main, referred to and fully elaborated upon in that decision, and there is no need to repeat an analysis or enumeration of them. It is sufficient to say that the circumstances of this case bring it well within the rule stated therein. We therefore hold that the instruction on the doctrine of the last clear chance was properly given to the jury, and that it was well within its province to find that the negligence of the motorman in not avoiding the accident was the sole proximate cause thereof.

Defendants make several charges of misconduct and error occurring at the trial, none of which requires a reversal of the judgment. They were addressed to the trial court upon motion for new trial, and we cannot say that it was an abuse of discretion on the part of that court to refuse a new trial because of any or all of them.

A reference before the jury by plaintiff's counsel to two sons of plaintiff being officers in the United States Army is cited as prejudicial misconduct. Such reference was made once during the examination of the plaintiff. It was stricken by the trial court and the jury was instructed to disregard it. The subject was again mentioned by plaintiff's counsel in his argument to the jury. No objection or request that the jury be instructed to disregard it was made upon the latter occasion. Plaintiff claims justification for the latter reference in that the medical expert called by him as a wit-

ness testified, without objection, that one of plaintiff's sons was called back from the army because of plaintiff's serious condition. He further attempts to justify these references on the ground that they simply serve to offset any prejudices that the jury might have against him because of his Italian birth. We do not agree that such references were justified or proper. In *Deibler* v. *Wright*, 119 Cal.App. 277 [6 P.2d 344], similar misconduct was a factor contributing to a reversal of the judgment. However, in this case, in view of the nature of the evidence, we cannot say that these comments were so prejudicial as to preclude a fair trial.

■ During the examination of the jurors on voir dire, the trial court made the following comment, "Well, I understand we are building up 'a large reserve in the municipal streetcar system, isn't that right?" This followed a statement by defendants' counsel to the effect that if there was a deficit in the funds of the municipal streetcar system such deficit would have to come from the taxpayers. The remark made by the trial judge was uncalled for and should not have been made; but no objection was made to such comment. We cannot say that under the circumstances it was prejudicial.

■ Complaint is made that defendants were not permitted to show their inability to produce as witnesses the sixteen passengers in the streetcar at the time of the accident. Defendants were permitted to show that these passengers could not be located, but objections were sustained to questions which inferred that they actually witnessed the accident and to others which related to where they were at the time of the trial. The rulings did not prejudicially limit the examination.

■ The trial court commented, during the examination of a witness: "Why all this emphasis on the color of the truck? . . . This accident did not happen at night. It was a daylight accident. . . . The visibility was good so I don't see what the color of the truck has to do with the accident." Testimony as to the color of the truck, however, was permitted without restriction. No response to the comment or assignment of error was made by defendants' counsel. If counsel believed the remarks to have been prejudicial he should have then made some objection, or at least should have explained to the court his purpose in emphasizing almost to the extent of undue repetition the matter of the color of the truck.

■ Defendants complain that the trial court, in instructing the jury, incorporated a phrase used by plaintiff's counsel in his argument. The phrase was one in common usage and its use could not, as contended, be construed as an endorsement of any part of the argument.

■ The State Compensation Insurance Fund had filed a lien as the insurance carrier to recover its medical expenditures on plaintiff's behalf. The trial court, during the trial, stated: ''It doesn't make any difference to you, anyhow. If the plaintiff doesn't recover, then the State is out the amount expended; and if the plaintiff recovers, then they have a lien. You are not concerned in the amount of this lien. You are not even concerned as to whether or not it is a proper charge. The State expended the money and they filed a lien hoping that they are going to get their money back.'' No exception was taken to the remark. In fact, the lien was referred to before the jury by both counsel without objection on the part of either. That it was a matter of no concern to the jury was a proper admonition. We see no merit in the contention of prejudice from the use of the word ''State'' instead of State Compensation Fund nor from the use of the phrase ''hoping that they are going to get their money back.''

During a conference in chambers in the course of the trial, the trial court advised both counsel that he would not instruct the jury upon the doctrine of the last clear chance. Counsel for defendants was notified, at the adjournment for the day during which arguments were being made and while he had ten to fifteen minutes left to argue the following morning, that the trial court would give such instruction. Complaint is made that this change in ruling necessitated a change in strategy and materially weakened the presentation of defendants' cause. The record does not disclose that any request for additional time for argument, if required, was made. The argument of counsel for defendants is not embodied in the record before us and so we are not able to judge the possible merit of this complaint. This point was urged before the trial court who heard the argument as a ground for a new trial, and it was determined adversely to defendants. We are unable from the record to say that defendants were in any way precluded thereby from a proper and adequate presentation of the argument.

■ Whether plaintiff suffered permanency of injuries

and future disability was an issue properly submitted to the jury. No complaint is made of the form of the instructions given upon this subject, but it is contended that they were erroneously given because there was no satisfactory evidence showing to a reasonable certainty that any permanency of disability resulted from plaintiff's injuries.

In support of this contention defendants rely upon certain portions of the testimony of plaintiff's witness, Dr. Ernest du Bray, one of the two physicians who attended the plaintiff and who was the only expert medical witness who testified at the trial. On direct examination the doctor testified with respect to plaintiff's ability in the future to carry on the occupation of plastering: "That of course is a heavy occupation and I think that there is some doubt as to whether he will be able to do that as a regular worker in that field. He might do it part time. He might get away with it for a while but it is doubtful to me if he can resume that heavy type of work." In a written report of an examination of plaintiff made in the month of January following the accident, the doctor had stated, "Examination at this time shows no medical disability with respect to his injury of last May." On cross-examination he testified that at the time of that examination all of the disabilities that plaintiff had suffered were completely healed and that, as far as he could find, plaintiff was suffering from nothing attributable to the accident. It is apparent, however, that the physician's testimony as to plaintiff's condition as disclosed by the medical examination referred only to the absence of objective findings of disability. In reference to a question by the trial court as to plaintiff's ability to do the work of a plasterer, the doctor testified: "He hasn't tried to do it as far as I know, so that, I don't know. It would be uncertain whether he would stand up to it on a routine day, in and out. The thing we have to measure a man's health by, is his blood pressure and his pulse rate and they have come back to normal; but that isn't after all the last word. The crucial test is letting him do it and then see what happens."

The gist of the expert medical testimony, therefore, was not, as defendants contend, that plaintiff had made a full recovery with no future disability. It was rather, in substance, that although a medical examination disclosed no objective evidence of present injury or disability, it was doubtful whether plaintiff would, by reason of his former injuries, be able to stand up to the heavy work of plastering,

and that the real test of his ability to do so would be by an actual trial at that occupation. The record discloses that in the latter part of October, after his discharge from the hospital and a two-month period of rest, plaintiff did return to his occupation of plastering. Both he and his employer testified that he was unable to do the work of that trade. After attempting to do this work for three days, he was required to go to bed. He subsequently obtained employment at a chocolate factory and was so employed at the time of the trial. Although the duties of·this employment were merely to watch a machine so that it would not overflow, he was exhausted at night therefrom and often was kept awake by reason of the severe pains in his back. If, as the jury apparently believed, plaintiff made an honest and sincere effort to resume his former occupation and was unable to do so, then the very test of future disability which the expert testimony prescribed was met.

It was not required that the doctor testify that he was reasonably certain that the plaintiff would be disabled in the future. All that is required to establish future disability is that from all the evidence, including the expert testimony, if there be any, it satisfactorily appears that such disability will occur with reasonable certainty. (*Bauman* v. *San Francisco,* 42 Cal.App.2d 144 [108 P.2d 989]; *Riggs* v. *Gasser Motors,* 22 Cal.App.2d 636 [72 P.2d 172]; *Ostertag* v. *Bethlehem etc. Corp.,* 65 Cal.App.2d 795 [151 P.2d 647].) The medical expert testified, in effect, that he doubted that plaintiff had no future disability but that he could not be certain until the plaintiff actually attempted his former occupation. The fact that such attempt was made and was unsuccessful was not only consistent with the expert testimony but answered the uncertainty therein. This, considered with the nature and extent of plaintiff's injuries, satisfactorily established the permanent inability of plaintiff again to engage in his former occupation and a consequent impairment of earning power. Admittedly plaintiff suffered severe injuries which almost proved to be fatal. There were at least twelve or fifteen rib fractures; the doctor stated that they were so numerous that he could not be sure that they were all demonstrated. Three of the first lumbar vertebrae were fractured, with displacement from the spine. There was considerable hemorrhage of the pleural cavity. He required hospitali-

zation for a period of sixty-five days, followed by a two-months' period of convalescence.

The cases of *Bellman* v. *San Francisco High School Dist.*, 11 Cal.2d 576 [81 P.2d 894], and *Silvester* v. *Scanlan*, 136 Cal.App. 107 [28 P.2d 97], relied upon by defendants, are not determinative in this case. They merely hold, in accord with the rules here stated, that the evidence must establish future detriment with reasonable certainty and that mere speculation or probability is not sufficient. The evidence of future disability in those cases was held to be insufficient because it was purely speculative, which is not the situation here.

As to defendants' contention that the verdict is excessive, we cannot say that it is so excessive as to warrant this court in holding that its amount shocks the sense of justice and raises the presumption that it was arrived at as the result of passion and prejudice rather than upon a fair and honest consideration of the facts. (*Slaughter* v. *Van Winkle*, 213 Cal. 573 [2 P.2d 789] ; *Bellman* v. *San Francisco High School Dist.*, *supra.*) In view of our conclusion that the future impairment of earning power of plaintiff was a proper element to be considered in its determination, we are unable to say that the verdict is without justification.

At the time of the accident plaintiff was fifty-five years of age. He was hospitalized for sixty-five days and required to rest for an additional period of two months. He is precluded from following his life-long trade as a plasterer at a wage fixed the day after the accident at $14 per day, and was required to accept less remunerative employment at the wage of $7.40 per day. Up to the time of the trial his loss of earnings amounted to approximately $2,500. His medical expenses amounted to $2,055.75. His present reduction of earning capacity amounts to more than $2,000 per year. His injuries were and continue to be exceedingly painful. The amount of the award was reviewed by the trial court upon motion for new trial and was not disturbed. We cannot say that such ruling was an abuse of the discretion vested in that court. We have examined each of the many cases cited by defendants from this and other jurisdictions where the amount of the award was held to be excessive. As defendants recognize, each case presents an individual problem and must be determined upon its own factual situation. The rulings in the cases cited can only be regarded as illustrative applications of the

rules we have already considered in measuring the damages. We find nothing in those illustrations which alters our views as hereinbefore expressed.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 14, 1946.