[Civ. No. 5748.   Third Appellate District.—September 25, 1937.]

DORA RIGGS, a Minor, etc., Respondent, v. GASSER
MOTORS et al., Appellants.

Hadsell, Sweet, Ingalls & Lamb, Dennis M. Duffy and A. R. Trower for Appellants.

Mervin C. Lernhart and J. Horton Beeman for Respondent.

PLUMMER, J.—In this action the plaintiff had judgment against the defendants for the sum of $20,000, for and on account of injuries suffered by the plaintiff in an automobile collision occurring in the city of Napa, on or about the 5th day of February, 1936.

The record shows that the defendant, Robert Merrill, an agent and employee of the other defendants, was driving an automobile easterly in the city of Napa, on a certain street called South Street, and that the plaintiff was riding with one Ben Riggs in an automobile being driven southerly on Randolph Street in the city of Napa. At the intersection of the two streets named the collision occurred, resulting in the injuries to the plaintiff hereinafter set forth.

Practically no contention is made that the defendant Robert Merrill was driving a Packard automobile other than in a careless and negligent manner. This is practically conceded in the appellants' brief where they state that a new trial would probably result in a verdict in favor of the plaintiff, and that the purpose of seeking a new trial is really to obtain, if possible, a verdict against the defendants in a lesser sum.

To sustain their contention that a new trial should be granted the appellants urge, first, that the court erred in giving certain instructions, and second, that the verdict is grossly excessive. We may admit that some of the instructions given by the trial court are not worded technically as they should have been, but in view of certain instructions given at the request of the appellants, and under section 4½ of article VI of the Constitution we must conclude that no injury has been suffered by the appellants for such reason.

Section 510 of the Vehicle Code reads: "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for the traffic on, and the surface and width of the highway, and in no event at a speed which endangers the safety of persons or property."

Section 511 of the same code then specifies certain lawful speeds under the conditions particularized. These, the court read to the jury, and also read section 513.

It is common knowledge that intersecting streets in cities present a continuing hazard, the degree of hazard depending upon the extent of the use of the intersecting streets and the surrounding circumstances or conditions of each intersection. Under such circumstances the basic law as set forth in section 510, *supra*, is always governing.

In the case of *Graybiel* v. *Auger*, 64 Cal. App. 679 [222 Pac. 635], the court said (referring to the basic rule then existing under a different numbered section, but which is now the section above numbered): "This provision of the section is just as much a portion of the law as that which allows a speed of thirty-five miles per hour under certain specified conditions."

In the case of *Dam* v. *Bond*, 80 Cal. App. 342 [251 Pac. 818], the court, in referring to the case of *Graybiel* v. *Auger*, *supra*, added: "In other words, it is not the absolute speed at which an automobile is being driven that determines whether it is, or is not being propelled at a reckless rate, but the conditions and circumstances of the highway at the instant of time must be taken into consideration, and if these conditions are such that the safety of persons and property require a much lesser rate of speed, it is the duty of the driver of the motor vehicle to slow down the speed of his car." (Hearing by the Supreme Court in the case of *Dam* v. *Bond*, *supra*, was denied.)

In the case of *Davis* v. *Brown*, 92 Cal. App. 20 [267 Pac. 754], the same question was presented to the court for consideration, and the rule referred to in the two cases just mentioned was approved and followed.

The district where the collision occurred appears not to have been sign-posted, and the suggestion is presented by the appellants that therefore a speed limit of forty-five miles per hour was and is allowable. But whether sign-posted, or not sign-posted, the basic law is always operative and the speed limits mentioned in section 511, *supra*, are at all times subject to the basic rule set forth in section 510, *supra*.

The fact of negligence on the part of Merrill being practically conceded, relieves us from considering any questions as to burden of proof.

The instruction given by the court to the jury, at the request of the plaintiff, and specially objected to by the appellants as being prejudicial error, is worded as follows:

"It is part of the duty of the operator of a motor vehicle to keep his machine always under control so as to avoid collisions with pedestrians and other persons lawfully using the highway. This rule of law, applied to the conduct of the defendant, Robert Merrill, the operator of the automobile involved in this case, and, if you believe from the evidence that at the time of, and immediately before the collision in question, this defendant did not keep his automobile under control so as to avoid collisions with pedestrians and other persons lawfully using the highway, then and in that event, I instruct you that he was negligent and would be liable in damages for any loss proximately occasioned to the plaintiff by reason thereof, provided plaintiff was without fault, which proximately contributed thereto."

The errors in this instruction being set forth as follows:

1st. That the instruction omits the test of ordinary care;

2d. That the operator is not absolutely required to avoid all accidents;

3d. That the instruction does not leave the question of negligence to the jury;

4th. It is a formula instruction which does not include the necessary elements.

In these particulars we may admit that the instruction is deficient, but an examination of the record shows that at the request of the appellants the court gave the following instructions to the jury in relation to the operation of the

automobile then and there being under the control of Ben Riggs. The giving of this instruction, we think, is a complete answer to any objections urged by the appellants. For that purpose we set it forth in full as follows:

"You are hereby instructed that it was part of the duty of Ben Riggs, while in the operation of his automobile, to keep the same always under control so as to avoid collision with other vehicles lawfully using the highways. He was under the duty at all times of being ever on the alert and vigilant and was likewise under the duty of anticipating and expecting the presence of other vehicles on said highway.

.    .    .    .    .    .    .    .    .    .    .    .

"You are instructed that it was the duty of Ben Riggs, while in the operation of his automobile, to anticipate the presence of other vehicles upon said highways over which he was operating his said automobile. The said Ben Riggs was bound at said time to use reasonable care to anticipate the presence of other vehicles having an equal right with his said automobile to be there. You are further instructed that Ben Riggs in order to avoid a charge of negligence was under the duty of keeping his said automobile under such control as would enable him, while in the exercise of reasonable and ordinary care, to avoid a collision with another automobile, the driver of which is using proper care and caution, and if the situation were such that a person of ordinary care and prudence acting in a similar situation would slow up his said automobile and stop in order to avoid the collision, Ben Riggs, driver of said automobile, was in said situation under the duty of so doing."

On the question of damages and what the jury might consider, the court read to the jury section 3283 of the Civil Code, as follows: "Damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof, or certain to result in the future." Appellants rely upon the fact that no witness testified absolutely that future results were certain to occur, but only gave their opinions as to what might and might not occur. We take it that it is the province of the jury to determine from testimony whether the injuries are such that future detriment is certain to occur, or rather, may be shown by the testimony to be so reasonably certain to occur as to be considered by the jury in determining the damages to be awarded. The fact that a witness may testify that in his opinion a future detri-

ment is certain to occur, does not make it certain that such detriment will occur, any more than a modified opinion or statement that future detriments do occur under like conditions may reasonably be apprehended to occur.

The court also gave an instruction as to what constituted an obstructed intersection. The record shows that the jury and the court, upon consent of counsel for the respective parties, viewed the premises and had before them a full view of the intersection where the collision occurred, and in support of the instruction we must assume that the conditions there presented warranted the giving of the same.

This brings us to a consideration of the injuries suffered by the plaintiff, and for which it is alleged that the damages awarded are grossly excessive, and that either a new trial should be ordered, or the verdict reduced.

The record shows that the plaintiff suffered a fracture of the skull, some injuries to one of her shoulders, a slight injury to the back of her neck, and some injury to the brain, causing injury to one of the eyes, apparently by the nerves being affected.

Several doctors testified, the main portion of their testimony being corroborative and supporting the testimony of Dr. Orval L. Kirkle. Before quoting his testimony we may state that the X-ray picture taken of the plaintiff's skull did not show the full extent of the fracture by reason of the fact that it was a flat picture, and the skull being round the X-ray showed only about two and one-half inches of fracture, whereas it is claimed that the fracture extended for a length of about five inches, as shown by the testimony of the doctors, from where the fracture began and where it ended. The testimony of Dr. Kirkle covers practically the whole field, save as to what occurred at the plaintiff's home, which is shown by the impaired condition of the plaintiff by reason of the accident, in the testimony of her mother and the testimony of her guardian *ad litem* which we need not set forth herein, but which shows the continuation of the effects of the injuries suffered by the plaintiff. Dr. Kirkle's testimony is as follows:

"I am a duly licensed physician and surgeon. I was admitted to practice in 1931. I became acquainted with the Riggs family a few months before February of this year. I saw Dora Riggs professionally on the 5th of February, 1936.

She was brought to my office. At that time she was very weak. She tried to walk in from the reception room, but we partly carried her and partly let her walk. She was very unstable, as far as her ability to walk was concerned. Part of the time she could answer questions perfectly all right, and then at times she would answer or not answer. Sometimes she would answer as though she did not know what we were talking about. Other times she would say, 'I didn't hear your question,' and we would have to state it again. She was in a state of shock—*not extreme shock but partial shock*. So far as her mental condition was concerned, she was dazed. She complained of headaches. She had a swollen head on the right side and her shoulder and neck. She stated she was nauseated but did not vomit. Examination revealed a bruise over the right shoulder and tenderness over the right side of the skull. There was no laceration. There was no bleeding from the outside. Because of the tenderness over the skull, we took an X-ray to see what it was. Later on X-rays were taken at the sanitarium. I advised that she be taken home and put to bed there. She was having severe pains, headaches and was still nauseated and complaining of it, and her blood pressure was varying at the time I was there at the house. She did have a blood pressure, which did vary a little bit, maybe five or ten points. She was apparently conscious part of the time and part of the time she was strongly out of the picture. She remained home in bed for two days. She was then taken to the St. Helena Hospital by ambulance. It was easier to care for her at the Sanitarium. We considered seriously the possibility of having to do a spinal puncture to relieve the increased blood pressure. At times it went up to 140–145 and I was afraid it would go up and we would have to do a spinal puncture to relieve the pressure, but it did not go on up and we did not have to do the spinal puncture. She remained in the Sanitarium one month. I saw her there on an average of three times a week. She was under the care of other doctors during that time. The X-rays you show me were taken at the St. Helena Sanitarium. These X-rays reveal a fracture of the right parietal region. There was a fracture beginning near the mid-line on the right side about an inch back from the ear, extending downward and forward just behind the ear into the mastoid region. The area on the flat X-ray plate measured two and one-half inches, but turning,

as the skull does, it would make it a much longer area. *There was no displacements of the fragments and no depression.* While she was in the hospital she was just semi-conscious. At times she was very nervous, very easily excited. Then she would regain total consciousness and she would be worried about what she missed or what had been going on about her. She was dizzy. During her stay in the hospital she didn't rest, *but she got over that dizziness a great deal after that.* The nausea continued more or less. At least, during the early part of her stay in the hospital she had to have her meals sent to her bed. Not under any consideration was she to get out of bed in the hospital. After she left the hospital she was taken to her home. At home, she was not permitted to get out of bed. Her mother waited upon her the same as the nurses waited upon her at the hospital. About the 10th of April, she was allowed to be out of bed and then only by the assistance of her mother. That was approximately five weeks after her return. She was not allowed to walk to and from the lavatory unassisted. Her condition has improved some—*she can be up and around.* Her first trip out of the house to go anywhere was when she came into town for Dr. Heegler's examination. That was approximately three weeks ago. There was a faint discoloration of the skin around the right eye. It wasn't a real black eye and it came on after she was in the hospital. She suffered a severe concussion of the brain. My opinion of the outcome of the injury is this—it is very *likely* that in the end the result will be *some permanent* damage. It is very frequent that we even find epilepsy, traumatic epilepsy, as we call it, following a severe brain injury. If the fracture of the skull is severe enough—if the injury is severe enough—*we might get that as a result, but nobody knows,* except for time, and time will only tell what will come here. No doctor could say with reasonable certainty that the results I have described would not follow. For a time she could not see, especially from the right eye. We didn't allow her to read, or try to see until she came home from the hospital, and while there she stated to me that there was a funny appearance from the right eye, and she could apparently see all right from the left, but if she would cover up her left eye, everything would be right before her. As far as I know she had no double vision. She wore glasses be-

fore this injury, though. At the time of the accident, there was probably the concussion, as I have stated,-and probably some hemorrhage into the brain. The concussion clears up moderately rapidly, but in the hemorrhage it is a very slow process of clearing up and that is why I say a hemorrhage, because of the fact it has taken this long before there is any beginning of clearing up even. There is some nonconvergence of the eyes—the right eye turns upward and inward. The girl hasn't the pep she had before. You asked the prognosis so far as headaches are concerned—that is a pretty hard question to answer, but I think that—I doubt very much that she will get over those headaches entirely under from six months to two years. *The eye condition is more or less permanent.* We don't know how long it will last, how much we can restore. It will take lots of treatment and lots of care, with proper exercise on her part to get any of it restored. She doesn't remember as well as she did. Her ability to concentrate is very poor. She will require a great deal of treatment before she is entirely over this, that is, entirely over this so far as we can get her over it. The main treatment so far as the head is concerned, is the eye treatment and that will last over many months probably before we are through treating and caring for her eyes. That will require the services of an eye specialist. She may be able to follow her school work at some time in the future, but I doubt very much that she will be able to attend school this coming year.''

We have taken the foregoing from the appellants' summary of the testimony. Following this testimony the appellants schedule a number of cases where judgments in damage suits have been reduced and a number of others where judgments have been sustained. This schedule also appears in appellants' memorandum of points and authorities in opposition to the plaintiff's motion to dismiss or affirm. While great industry has been shown by the appellants in the collection of these cases, the question of damages is one with which an appellate court can deal with no more certainty than the jury which heard the testimony, and before which the cause was tried. The cases all practically hold that the determination of whether the allowance of damages has been excessive is in the first instance for the trial court to determine. In the instant case the question of excessive damages was presented to the trial court, and the trial court denied the

appellants' motion for a new trial, which motion was based partly upon the alleged allowance of excessive damages. While the damages allowed in this case appear to be quite large, we find nothing in the record which indicates that the damages were augmented by reason of any passion or prejudice. The record shows that the case was fairly tried, and appears to have been conducted in such a manner as not to arouse any ill-feeling or in such a manner as to induce the jury to seek to punish the defendants, or any one of them, rather than to award just compensation. No allowance was made for special damages, and in considering the amount of damages awarded, we think an appellate court is justified in taking into consideration the costs which the plaintiff in such a case must incur that are not compensable as such. The damage to the brain and the injury apparently to the nerves of one of the eyes which causes the affected eye to turn up, presents a serious injury for which a sum of money may to the average person seem impossible of measurement. That question we think is as much within the judgment of the jury as within the province of any court, and unless we can say, with reasonable certainty, that such injuries will not affect the future of the plaintiff, we are at a loss to say that the damages awarded are the result of either passion or prejudice.

We do not consider that it would be at all helpful to lengthen this opinion by referring to the cases where verdicts have been modified or where damages have been allowed to stand as awarded by the jury. We may add, however, that in a number of cases it does appear that the jurors might have awarded a considerable sum in addition to the damages allowed, without crossing the line called excessive.

Being of the opinion that we are not justified in concluding that the damages in this case are neither excessive, nor were allowed by reason of any passion or prejudice, it follows that the judgment must be affirmed. And it is so ordered.

Thompson, J., and Pullen, P. J., concurred.