[Civ. No. 14509.   First Dist., Div. One.   Mar. 8, 1951.]

CONSTANCE LEMERE, Appellant, v. SAFEWAY STORES, INC., et al., Respondents.

Howard Magee and Philander Brooks Beadle for Appellant.

Tinning & DeLap and J. Vance Porlier for Respondents.

BRAY, J.—In an action for personal injuries a jury awarded plaintiff Albert O. Lemere $8,850 and plaintiff Constance Lemere $7,500. Plaintiff Constance appeals from that

portion of the judgment entered thereon which awarded her only said sum of $7,500, claiming that certain instructions are erroneous. Plaintiff Albert did not appeal, nor did defendants.

## Evidence

On November 15, 1947, while shopping in the Safeway Store at Pittsburg, plaintiff Constance[1], 22 years of age, tripped over a box of beer bottles that had been left standing in an aisle. She was knocked unconscious. She sustained a deep cut on the leg and minor cuts on her hand; also head injuries, and apparently a compression fracture of the twelfth thoracic vertebra. There was some disagreement in the evidence concerning this injury. She claimed her right leg was paralyzed for approximately five months. She was in a hospital for 38 days immediately following the accident and was confined to her bed for another five or six months. From then until the trial (a period of approximately 15 months), she had been confined either to bed or lying down, an hour being the longest she had stayed up at any one time. She appeared in court in a wheel chair. She had been attended by at least nine doctors, and been in four different hospitals. She was confined in the Antioch Hospital on nine different occasions, a total of 127 days (the last confinement of seven days being approximately five months before the trial). Her right leg was in traction for approximately 20 days. Then both legs were placed in traction. Traction had been applied eight or nine different times. She was in a cast from the chest to below the hips for about six months. A second cast remained on about four months. Day and night since the removal of the cast she had been required to wear a steel and canvas brace. Without the brace she claims that she has terrible pains in her back and leg. She claims that severe headaches persist, and that continuously, except for about 30 days, she has run a fever. She testified that before the accident she was in good health, worked as a waitress, and in addition, with the help of her mother-in-law, did household duties for her husband and child. Now, the housework was done entirely by the mother-in-law. She worked as a waitress for approximately 18 months prior to a month before the accident, earning with tips an average of about $75 per week. The bills for hospital, nursing, drug and medical expense to

---

[1]Herein referred to as plaintiff unless otherwise noted.

the time of trial totaled $7,096.62. This amount probably was included in the jury's allowance to the husband of $8,850.

■ Plaintiff concedes that the damages allowed her were not inadequate as a matter of law, but contends they are inadequate as a matter of fact. She contends that by the allowance of the special damages including hospital fees incurred shortly before the trial and medical expenses to the time of trial, the jury must have found that she was injured by the fall and that those injuries continued at least until the time of trial. Defendants contend, first, that she received no serious injury particularly, no compressed fracture of the twelfth thoracic vertebra, and secondly, if she did, she had long since recovered fully and was now exaggerating her condition. Depending upon whether or not plaintiff's testimony as to her subjective symptoms is believed, the evidence would support either a finding that she suffered serious injury from which she had not recovered and which probably would continue in the future, or a theory either that she had not injured her vertebra, or, if she had, that she had fully recovered. Obviously, the jury must have found that she received injury as it apparently allowed the husband full compensation for the expenses incurred and gave him additionally approximately $1,500. About 22 months had elapsed between the accident and the trial. Plaintiff contends that the jury should have awarded her $75 per week loss of wages for that period, or approximately $6,600, leaving from the verdict only about $900 for pain and suffering and permanent injury, if any. However, its award to the wife might indicate that it believed she had fully recovered and that she could have returned to work before the trial.

There was a conflict in the medical testimony, even as between plaintiff's doctors. Defendants called but one doctor as to plaintiff's condition resulting from this accident. He is an orthopedist and had examined plaintiff in March, 1946, for claimed injuries in a Greyhound bus accident in October, 1944. She then complained of pain in the lower portion of her back and down into her leg. The X rays taken of the twelfth thoracic vertebra at that time showed no pathology. He again saw plaintiff about a year following the accident here, at which time he took X rays, including the twelfth thoracic vertebra, but could find no evidence of injury, nor could he find any such evidence in other X rays taken by plaintiff's doctors and shown him, in which some of plaintiff's doctors found evidence of fracture. He concluded she was

"a faker of her injury." Evidently, the jury did not believe his testimony to the effect that she had not been injured.

Dr. Dozier, a general practitioner, examined plaintiff the night of the injury and he and Dr. Fischer undertook to treat her. He testified that she was still disabled, spending most of her time in bed, experiencing considerable pain, and having improved very little over the past six months. He found a slight compression fracture of the twelfth thoracic vertebra, a condition he did not find in the X rays shown him taken in 1944. He had been unable to determine from the X rays whether the fracture was fresh or old, although now he believed it to have been a fresh one. Plaintiff has run a fever at various times ever since her accident, for which the witness and other doctors have been unable to account. The witness could not predict how long the present condition will continue. He found nothing organically wrong with plaintiff's right leg and he found it difficult to answer a question as to what its functional disorder was. He last saw the patient a day or so before the trial and she was in bed complaining of considerable pain.

Dr. Fischer, an orthopedist, was called into consultation by Dr. Dozier. He first saw plaintiff approximately 10 days after the accident. He found muscle spasm of the lumbosacral musculature and tenderness in the small of the back and in the low back. Although it was a little hard to tell, owing to her having a lot of pain and being upset emotionally, he did not think there was any decrease in the motor power of her legs. She ran a fever while in the hospital, although he was not impressed with it then. It has been an intermittent fever since. He and the other doctors have been unable to uncover its cause. Principally because of her fever, he sent her to Dr. Paul Aglar of the University of California where tests were made and she was studied, but they were unable to find the cause. Because of the pain in her leg he sent her to a neurosurgeon, Dr. Lester Lawrence, who had her admitted to Providence Hospital and they were unable to find the cause. She was studied at Stanford Hospital where they likewise were unable to find the cause. Plaintiff told him that she had previously slipped in a Greyhound bus and had bruised her sacrum which would be just below the point where she now has maximum tenderness. He examined the 1944 X rays and found no abnormality in the vertebra. He found in the X rays of the 1947 accident a compression fracture of the twelfth dorsal (thoracic) vertebra. He had

seen plaintiff roughly 15 to 20 times. The patient is still disabled. He felt that she had received a back sprain and that there had been some improvement but it had been very slow, very discouraging. Without knowing the reason for the fever it is difficult to give an accurate prospect of the future. She will probably continue to improve slowly over a long period, possibly one to three years. She will probably have some permanent residual disability, although it is difficult to say because there are unknown factors. While there is a little irregularity of the inferior and superior surfaces of the twelfth dorsal (thoracic) vertebra shown in the 1944 films, these are quite normal. At the time he first saw plaintiff and the X rays of her 1947 accident he thought the fracture was an old one. He did not attach much significance to it because it was giving plaintiff no trouble and the pain of which she complained most bitterly was lower down. He thought if it was a compression, it was a mild one and was not giving her much trouble. He put plaintiff into traction although traction is not standard treatment for a compression fracture, because he thought her injury was to the muscles and ligaments of the lumbosacral region. The first brace he put on did not cover the twelfth vertebra and was not for support of it. Plaintiff was hospitalized once after falling from stepping on her shoe lace and twisting her back. In a report to Dr. Dozier (July 8, 1948) he stated: ''I notice that patient tends to stand more on her right leg than on her left, which is not what one would expect with the right more painful than the left. . . . I feel that patient is making good progress, and will continue to improve over a considerable period of time.''

Dr. Aglar in his report to the witness stated, in effect, that because of inability to arrive at a conclusion concerning the cause of plaintiff's disability, he referred the patient to a psychiatrist, Dr. Burke, who in a preliminary interview was unable to make a diagnosis, feeling that he met with considerable resistance. Further investigation had to be terminated because plaintiff refused to allow a sodium amytol interview. Dr. Aglar found no evidence ''of any complicating medical disorder'' and concluded ''that the psychiatric aspects of the illness have not been sufficiently investigated to allow a definite statement to be made regarding that.'' On one occasion plaintiff was in the hospital for a couple of days for an acute pelvic infection.

Dr. Lawrence, a neurosurgeon, reported April 17, 1948, that plaintiff stated she was unable to raise her leg and when asked to do so would apparently make no effort to move it. The leg moved without difficulty when she was performing motions in bed, such as rolling over. She had no apparent pain. Films showed some wedging of the twelfth thoracic vertebra and some irregularity of the tenth and eleventh, which appeared to be degenerative changes. No evidence of fracture could be seen. She showed no evidence of organic damage to her nervous system. Disuse of the right leg was entirely on a functional basis. She stated she could feel a light touch when stimulated in the leg with the point of a pin and a pin prick when stimulated with its head. She had no pathological reflexes. ''Do not believe that there is any organic basis'' for her complaints.

Dr. Fischer felt she had had something organic in the musculoligamentous structure, and that she had received a back sprain. On March 10, 1949, he wrote plaintiff a letter in which he said that she had ''infectious spondylitis of the non-ankylosing type, which was precipitated by injury'' and would ''probably be disabled for at least another six months from doing the type of work you were doing at the time of your injury.''

Dr. Mensor, an orthopedist, saw plaintiff at Dr. Dozier's request in December, 1948. She was ill, apprehensive, had definite limitation of motion of her spine on examination. The X rays disclosed a compression deformity, squeezing or wedging of the twelfth thoracic vertebra. He concluded her persistent back symptoms were due to this condition. On examining the 1944 X rays he found no such condition. The fact that she had worked as a waitress for approximately 18 months between her former accident and this one would indicate that she had a good back. He had seen plaintiff an average of a couple of times a month. He had suggested the higher body cast for her and then a brace. He has urged her to take it off as much as possible. She has cooperated and has had it off as much as two or three hours at a time, but she claims her symptoms increase and she gets relief by putting it back on. Her back motion is noticeably improved. Her localization of and distribution of pain still persist. If her symptoms keep persisting after the brace has been removed altogether, he would recommend a bone graft operation. For this type of fracture the average case should be

healed in about six months and within a year residual symptoms on conservative therapy be pretty well eliminated.

Dr. Sanderson saw plaintiff in 1944 with reference to a low back injury received by her in a Greyhound bus fall. She complained of pain in the lumbosacral region of her back. X rays taken at that time showed no abnormality in the region of the twelfth dorsal vertebra. On examining X rays taken after the present accident he found a compression fracture of that vertebra. When he saw her in December, 1944, she was practically well except that she had some pain in her back when she moved around. He would not expect that in March, 1946, she would have paralysis of the legs. The average period of disability from this type of fracture is six months to a year.

Defendants called Dr. Barron, a general practitioner, who saw plaintiff in connection with the Greyhound bus injury. The accident happened October 12, 1944, and he first saw plaintiff in March of 1945 and thereafter on 79 occasions until March 2, 1946. The treatment consisted mainly of physiotherapy and analgesic medication. She complained that she staggered and fell on occasions because of weakness of both legs. She complained mainly of pain in the lumbosacral region, in both legs, and occasional headaches and dismenorrhea. He never saw her after the conclusion of the Greyhound case. She was pregnant at the time of the fall but Dr. Hansen whom he consulted informed him that she had a fairly normal delivery. X rays he saw during that period were negative. He diagnosed her condition as a sprain or strain of the low back.

When asked if at any time before this accident she had ever hurt her back plaintiff said that in October, 1944, she had fallen and bruised the end of her spine. She said that she had fully recovered and there was no permanent injury. This referred to her slipping off the steps of a Greyhound bus. In her complaint against the Greyhound she alleged that her injuries were, among others, "severe straining of plaintiff's entire spine; stretching and tearing of plaintiff's internal organs; a severe spraining of plaintiff's sacro-iliac joints"; that she believed her injuries were permanent in nature. In her deposition in that case, taken March 1, 1946, she testified that her back was injured: at times she could not walk as she became numb and kind of paralyzed, staying that way sometimes for an hour or two and happening two or three times a week. Her whole back ached continually. Her back condi-

tion was not improving but was worse. She felt "dead inside." She had not been able to do any housework. Dr. Barron, who was treating her, released her the day of the Greyhound trial, March 5, 1946. At that trial she testified that she had hurt her back, her spine up into her neck; that she had pain continually from the accident until the trial, and that her back had not improved any. It pained terribly and was no less since the birth of the child. She was pregnant at the time of the fall and her baby was born in January, 1945. The testimony in the case at bar shows that plaintiff went back to work as a waitress approximately three weeks after the trial of the Greyhound case.

On July 4, 1946, plaintiff ate some glass in her food in a San Francisco restaurant which made her deathly sick and caused her to lose two or three days work. In the complaint against the restaurant, filed November 12, 1946, she alleged that, among others, she had received severe injuries of the stomach and other parts of the alimentary canal, causing a three months' miscarriage; that she was rendered sore, sick, and disabled thereby, suffered severe and excruciating pain, and that she believed her injuries were permanent in character. Also she spent four days in a hospital where she received a blood transfusion. She testified in the case at bar that except for a few days she worked for 18 months prior to a month before the Safeway accident. This would cover the period between the restaurant incident and the filing of her suit against the restaurant four months later. In that complaint she alleged that by reason of the injuries she was unable to work as a waitress or to take care of her household duties because of incapacity. Thus, she was actually working at a time when in that complaint she apparently claimed to be incapacitated from work. In her complaint in this action, filed approximately three months after the accident, plaintiff alleged that in addition to other injuries, she had received damage to the spine and spinal cord with spinal nerve injuries resulting. None of her doctors substantiated this claim. She explained in effect that she could not remember whether she read the various complaints or discussed with the lawyers the injuries to be set forth therein.

Having in mind that we are required, on the issue of damages, to consider the facts most favorable to defendants, there is substantial evidence upon which the jury could find (as it evidently did) that plaintiff had practically recovered from

any injuries received in the accident, and that she grossly exaggerated her present condition, as she evidently exaggerated the injuries received in the Greyhound bus fall and the glass incident. The only testimony concerning present and permanent disability was that of Doctors Dozier and Mensor. Neither was very definite and their prognosis was to considerable extent based on plaintiff's subjective symptoms, which, of course, the jury could (and undoubtedly did) disregard. Plaintiff probably received a compressed fracture. Whether it left any disability or residual conditions depended again upon whether plaintiff's complaints of pain and paralysis were true. Apparently, the treatment which was first given plaintiff for low back sprain delayed her recovery from the fracture. She still has recurrent slight fever, for which none of the doctors, with the exception of Dr. Fischer, could find a cause. Taking the evidence as a whole, there is substantial evidence to support the jury's findings, and to show that the award given was a substantial one for the injuries received. It is a fallacy to assume that the jury believed that plaintiff's loss of wages was as great as she claimed. She received $30 per week wages. She claimed that in addition she received $45 per week in tips. The jury did not have to believe this testimony as to the amount of the tips. Hence, how much was given for loss of wages and how much for the injuries depends upon what credence the jury gave to her testimony, both as to the amount of income she previously had and as to whether she was still suffering as claimed.

## INSTRUCTIONS

1. Plaintiff contends that in refusing to give certain instructions offered by her, and in giving certain instructions, the court, in effect, required a different degree of proof between past damages and injuries and future damages and injuries; that the court required as to the past, that the injuries and damages need be shown only to be *reasonably certain*, but as to future damage and injuries they must be shown to be *certain*. It is true the court used the expression *reasonably certain* more often in relation to the past situation than it did as to the future, but taking the instructions as a whole it appears that the court used *reasonably certain* and *certain* practically interchangeably, and that the instructions were not such as to give the jury the impression that they were to apply one rule to the past and another to the future. The

instructions relative to this subject follow:[2] "You can award the plaintiffs, in case you decide they are entitled to recover only *such actual damages as the evidence shows to a reasonable certainty,* and by a preponderance of the evidence, they have sustained, by reason of the injuries complained of. . . . The law only permits such damages to be awarded in this class of cases as will pecuniarily compensate for the injuries sustained, if any, and *such as are certain to result therefrom in the future.*" An instruction in the usual form for mental suffering stated that a recovery could be had for something in addition to physical pain. It included mental suffering which will vary among other things with "the nature and character of their injuries, whether permanent or temporary . . ." "If your verdict is for the plaintiffs, you may award Constance Lemere such damages within the amount named in the complaint, as in your opinion, *will reasonably and fairly compensate her* for the injuries proved to have been sustained, if any, or *certain to result therefrom in the future* and proximately caused by the alleged negligence. In estimating the amount of such damages, if any, you may take into consideration what before the accident was her health and physical condition, the nature, extent, duration and severity of the injuries sustained, if any; their character, whether temporary or permanent; the extent, degree and character of mental and physical pain, anxiety and suffering, if any, *endured or certain to be endured in the future.* You may also take into consideration such sum as will compensate said plaintiff Constance Lemere *reasonably for the loss of earning power occasioned her by the injury in question, and from which she is reasonably certain to suffer in the future.* In fixing this amount you may consider what said plaintiff's health, physical ability, and earning power were before the accident and what they are now, the nature and extent of her injuries, *whether or not they are reasonably certain to be permanent, or if not permanent, the extent of their duration,* all to the end of determining the effect of her injuries, if any, upon her future earning capacity and the present value of the loss so suffered. . . . If you find that Mrs. Lemere was unusually susceptible to injury and damage, that fact alone will not relieve defendant from liability in monetary damages

---

[2]In the interests of space we have omitted portions. However, a reading of the whole of the instructions more forcibly impresses the fact that the hearer would find no distinction as claimed. Emphasis added wherever "certain" or "reasonably certain" is used.

for any, and all, disability and damages resulting to her solely and proximately from defendant's negligence." The court instructed at some length on plaintiff's expectancy of life under the mortality tables. The court instructed concerning plaintiff Albert Lemere's right to recover consequential damages, stating, among other things: "Such consequential damages include compensation for any pecuniary loss sustained by him to date and which he will, *with reasonable certainty,* sustain in the future because of any resulting inability of Constance Lemere to perform the wifely services which she was able to perform before the accident. Mr. Lemere's consequential damages also include the reasonable value of all medical and hospital expenses *reasonably required, both to date, and in the future,* for the care and treatment of any injuries to his wife proximately resulting from the accident."

The court refused plaintiff's instruction 27. This instruction is practically the same as the one given by the court[3] except that where the court's instruction said "mental and physical pain, anxiety and suffering, if any, endured *or certain to be endured* in the future" plaintiff's instruction stated, "mental pain or suffering which you believe from the evidence said plaintiff is reasonably certain to suffer in the future." In the court's instruction on loss of earning power[4] it is stated that the jury could consider in fixing its amount whether plaintiff's injuries were *reasonably* certain to be permanent, while the portion of plaintiff's instruction 27 referring to loss of earning power used other language which did not refer to either reasonable certainty or certainty as to the future, other than as it related back to the first part of the proposed instruction. Plaintiff's instruction 36 in referring to damages for physical pain and mental anguish stated ". . . and which she will be reasonably certain to suffer in the future." Instruction 26, concerning future effects and medical testimony, stated: "If, therefore, it satisfactorily appears with reasonable certainty . . . that plaintiff . . . will suffer detriment in the future . . ." such future detriment is an element to be considered in assessing damages.

Interestingly enough, all of the instructions given by the court, those using only the word "certain" and those using the words "reasonably certain," have been held to be correct

[3, 4]See instruction quoted above, p. 722.

instructions. Thus, it has been held that an instruction in the words of section 3283 of the Civil Code—"Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future"—is sufficient. (*Lonnergan* v. *Stansbury*, 164 Cal. 488. [129 P. 770].) In that case the instruction stated that the damages must be "reasonably probable." The court said that these words might well be omitted, and, in effect, "certain to result in the future" used instead. See, also, *Bauman* v. *San Francisco*, 42 Cal.App.2d 144, 165 [108 P.2d 989]. On the other hand, in *Hoy* v. *Tornich*, 199 Cal. 545 [250 P. 565], it was held that using the expression "reasonably certain" (p. 555) as to future suffering and damages was proper. To the same effect, *Parsell* v. *San Diego Consol. G. & E. Co.*, 46 Cal.App.2d 212 [115 P.2d 539]. Thus, the instructions given were proper in themselves. If, however, taken together, they would sound conflicting or would be confusing to the jury, then they would be improper. Reading them as a whole, we do not believe that the jury would be confused or would draw the conclusion that any different standard of certainty was required as to future conditions or damages from past or present ones.

To recapitulate: The court referred to "actual damages as the evidence shows *to a reasonable certainty*" the plaintiffs have sustained. ("Reasonable" is here applied to the past.) Then, it stated that the law permits such "damages to be awarded" as will "pecuniarily compensate" for the injuries "sustained" and such as are "certain to result" in the future. ("Certain" is here applied to the past, and the future.) The jury may award to Constance such damages as will "reasonably and fairly compensate" her for injuries "proved to have been sustained" or "certain to result therefrom in the future . . ." (As to "injuries," this applies the word "certain" to the past and the future. "Reasonably" and "fairly" are here used only in reference to the ascertainment of the "pecuniary" equivalent of those "proved" or "certain" injuries.)

In estimating damages for Constance's "mental and physical pain, anxiety and suffering," the jury was told to consider the extent, degree, and character thereof "endured or certain to be endured in the future." (Here, again, "certain" applied to the past and the future.) As to Constance's loss of earning power, the judge told the jury to consider such sum as would compensate her for the loss of earning power "occasioned" and from which she is "reasonably certain" to

suffer in the future. (Here, "certain" applies to the past; "reasonably certain" to the future.) In "fixing this amount," the jury was told they might consider Constance's health, physical ability, and earning power as they were before the accident and what they are now; the nature and extent of her injuries, whether or not they are "reasonably certain" to be permanent, or if not permanent, the extent of their duration. ("Certain" as to the past; "reasonably certain" as to the future.) Albert's consequential damages, the judge told the jury, include *compensation for any pecuniary loss* "sustained by him to date" and which he "will, with reasonable certainty, sustain in the future . . ." ("Certain" as to the past; "reasonably certain" as to the future.) In that connection, the jury was told that Albert's consequential damages included the "reasonable value" of all hospital and medical expenses "reasonably required, both to date, and in the future." (Here, "reasonably" applies to the past and the future, and is applied in a double sense: it is the "reasonable *value*" of those expenses (services) that are "reasonably *required*.")

The court instructed that the jury must not single out any single instruction or portion thereof, but must "consider all the instructions as a whole, and to regard each in the light of all the others." ". . . the charge to the jury must be read in its entirety, each instruction being considered in connection with the others." (*Westover* v. *City of Los Angeles,* 20 Cal.2d 635 [128 P.2d 350].)

2. The court refused plaintiff's instruction 26 which stated, among other things, that in determining what the future effects of the injuries sustained would be, a doctor is not required to testify that he is reasonably certain that the plaintiff will suffer ill effects in the future, and that all that is required is that from all the evidence, including the expert testimony, it satisfactorily appears that such detriment will occur with reasonable certainty.

Plaintiff's instruction 27, likewise refused, was similar to one of the instructions given by the court except that in reference to future pain and suffering it stated the words "reasonably certain."

Plaintiff's instruction 32, also refused, also dealt with the determination of whether plaintiff's injuries were reasonably certain to result in future detriment. It stated, further, that expert testimony of medical witnesses as to the danger that evil consequences will result in the future is a proper

element to be included in assessing damages and that it was for the jury to determine from the expert evidence as to medical probabilities whether detriment is reasonably certain to occur.

■ Plaintiff's first contention concerning these three instructions is that, if given, they would have avoided the contradiction or confusion which she claims resulted from the use of the two expressions "certain" and "reasonably certain." But, as we have pointed out, taking the instructions as a whole, there was no such confusion or contradiction, and hence there was no error in refusing the instructions.

■ As to instructions 26 and 32, plaintiff contends additionally that their subject, that of expert testimony, was not included in the instructions given.

The court instructed as follows: "The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnesses. A person who by education, study and experience has become an expert in any art, science or profession, and who is called as a witness, may give his opinion as to any such matter in which he is versed and which is material to the case. You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound." "If from the evidence in the case and under the instructions you find the issues for the plaintiffs, then in order to enable you to estimate the amount of such damages as you may allow for pain and suffering, it is not necessary that any of the witnesses should have expressed an opinion as to the amount of such damages, if any. You may estimate such damages from the facts and circumstances and evidence and by considering them in connection with your own knowledge and experience in the affairs of life. With regard to pain and suffering the law prescribes no definite measure of damages, but leaves such damages to be fixed by you as your discretion dictates and as under all the circumstances may be just, reasonable and proper, not exceeding the amount prayed for in the complaint."

Taking these instructions with the others given, the subject of the proffered instructions was sufficiently covered, although not in the language offered by plaintiff. "A party is not entitled to have the jury instructed in any particular

phraseology, and may not complain on the ground that his requested instructions are refused if the court, of its own motion or otherwise, correctly announces the substance of the law applicable to the case." (*Luis* v. *Cavin*, 88 Cal.App.2d 107, 115 [198 P.2d 563].) As authority for the contention that these instructions should have been given, plaintiff cites *Cordiner* v. *Los Angeles Traction Co.*, 5 Cal.App. 400 [91 P. 436]; *Riggs* v. *Gasser Motors*, 22 Cal.App.2d 636 [72 P.2d 172]; *Bauman* v. *San Francisco, supra* (42 Cal.App.2d 144); *Ostertag* v. *Bethlehem etc. Corp.*, 65 Cal.App.2d 795 [151 P.2d 647], and *Paolini* v. *City and County of San Francisco*, 72 Cal.App.2d 579 [164 P.2d 916]. In none of these cases was there any reference to instructions on this subject. In fact, in all except the Cordiner case, the court was discussing, not instructions, but evidence of experts and its effect. In the Cordiner case, the court discussed expert testimony and its effect, and then stated that many of appellant's authorities related to the form of instructions given for the guidance of the jury where damages for future results of injuries were sought. However, as the form of these instructions was not given, nor was there any other mention of the instructions, the case is not of much value on this question. While probably plaintiff's instructions 26 and 32 correctly state the law, plaintiff has cited no authorities holding that the failure to give such instructions where the court has given other instructions on expert testimony is error.

■ 3. Plaintiff's offered instruction 22 adopted language of Civil Code, section 3333, to the effect that the measure of damages would be the amount which would compensate for all the detriment proximately resulting from the injuries involved, whether such damages could have been anticipated or not. Plaintiff's main concern is that while the court may have fully covered the question of detriment, the attention of the jury was not called to the fact that plaintiffs would be entitled to full damages even though defendants could not have anticipated that a person falling over a negligently placed box would be seriously injured. The main portion of the instruction was fully covered by the other instructions given. For example, the court instructed that defendants would be liable, if at all, for "any and all disability and damages resulting from the defendants' negligence."

So far as the portion dealing with nonanticipation is concerned, while the instruction probably should have been given,

the failure to give it could not have been prejudicial. The court thoroughly instructed on the elements of damage which could be considered; there was no issue on the question of anticipation, nor even any suggestion that for recovery the results must have been anticipated; therefore the jury could not have been misled on this subject.

4. As to plaintiff's instruction 30 which was refused, it merely gave a little more detail than the court's instruction on mental suffering. The court's instruction was sufficient.

5. Plaintiff's proposed instruction 33 commented on the fact that the value of the dollar has changed materially from what it formerly was and told the jury that they should have this fact fixed in mind and base their verdict on the value of the dollar at the time of the verdict. Plaintiff contends that by not having this instruction the jury might have assessed damages as of the date of the accident, approximately two years prior. As support for the instruction, plaintiff refers to *O'Meara* v. *Haiden*, 204 Cal. 354 [268 P. 334, 60 A.L.R. 1381], and *Sim* v. *Weeks*, 7 Cal.App.2d 28 [45 P.2d 350], and other cases. In none of them is such an instruction considered. They are all cases dealing with the right of appellate courts to consider the changed value of the dollar in passing on the adequacy of verdicts. No case .has been cited holding that it is error not to give such instruction. We doubt if it is necessary to remind a jury today of the fact of the diminished power of the dollar. Such fact is brought forcibly home to them every time they patronize the meat market, the grocery store, or any other trade mart. Nor is there any reason to assume that the jury would assess damages as of any other date than the one on which they rendered their verdict. Particularly is this so in view of the fact that apparently they allowed the husband medical and hospital expenses down to the date of trial.

Moreover, the court did charge that as to loss of earning power the jury might consider the nature and extent of her injuries, etc., all to the end of determining the effect of her injuries "upon her future earning capacity and the *present* value of the loss so suffered." (Emphasis added.) Again, the court charged that they might estimate damages "by considering them in connection with your own knowledge and experience in the affairs of life." There was no error in not giving this instruction.

As there is no claim of insufficiency of evidence as a matter of law, the only relevancy of the claim of insufficiency of evi-

dence as a matter of fact is on the question of the possible effect of error, if any, in the instructions. The evidence most favorable to defendants shows that there was no such insufficiency.

■ Moreover, there is not necessarily any inconsistency in the verdicts as to Albert and Constance. They are both consistent with the deduction that the jury believed Constance had fully recovered, and allowed neither anything for future damage. The jury may have allowed the husband all of his out-of-pocket expense to the time of trial on the theory that her exaggeration of her injuries had actually cost him that much, but that both as to her and him, the termination of the lawsuit should terminate the necessity for further expense. They may have felt that although not amounting to a conscious malingering, her exaggeration of her condition would end with the litigation. Reading the instructions as a whole in connection with the evidence of her own doctors, most of whom felt she had recovered (one of them reported "lack of cooperation") there is no justification for the claim that the intermingling of "reasonably certain" and "certain" in the instructions could have influenced the jury in refusing to allow damages for the future.

It might well be pointed out concerning the claim that in fact the verdict was inadequate that the trial court denied a motion for new trial, thereby passing on the adequacy of the verdict. As said in *Brown* v. *Boehm*, 78 Cal.App.2d 595, 603 [178 P.2d 49] : ". . . in view of the fact that the trial court who heard and saw the witnesses, and presumably weighed the evidence on the motion for a new trial, was satisfied with the amount of the verdict, . . . every intendment is to be indulged here in support of its action . . ."

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 7, 1951, and appellant's petition for a hearing by the Supreme Court was denied May 3, 1951.