[No. D003989. Fourth Dist., Div. One. Sept. 25, 1987.]

AUGUST Da SILVA et al., Plaintiffs and Appellants, v.
PACIFIC KING, INC., et al., Defendants and Respondents.

[Opinion certified for partial publication.[1]]

---

[1]Pursuant to California Rules of Court, rule 976.1 and 976(b), this opinion is certified for publication with the exception of section IV.

**COUNSEL**

Dennis A. Schoville, Marcelle E. Mihaila, Jan Driscoll and Gray, Cary, Ames & Frye for Plaintiffs and Appellants.

Wilner, Narwitz, Lewin & Klein, Lawrin S. Lewin and Peter S. Forgie for Defendants and Respondents.

## OPINION

BENKE, J.—

### SUMMARY

Plaintiff and appellant August Da Silva brought suit against defendants M/V *Mary Antoinette* (*Mary Antoinette*) and Pacific King, Inc. (Pacific King) under the Jones Act (46 U.S.C. § 688) and general maritime law. After a trial the jury found that Da Silva was injured as a result of the unseaworthiness of the *Mary Antoinette.* The jury awarded Da Silva $78,500 in compensatory damages and $17,000 in past and future "medical cure." However the jury refused to award Da Silva's wife, who is also a plaintiff and appellant, any damages for loss of consortium.

On appeal Da Silva contends the trial court erred in instructing the jury as to the applicability of a federal safety regulation and the appropriate rate of "maintenance and cure." In addition Da Silva contends defense counsel was guilty of misconduct warranting a new trial. Finally Da Silva and his wife argue that his compensatory damages are inadequate and that the jury's failure to award any damages for loss of consortium was erroneous.

None of the Da Silvas' arguments has merit. We affirm.

### DISCUSSION

### I

### *Jury Instructions*

A.  "Sundown Sets"

At trial the parties did not dispute the fact that on October 7, 1983, Da Silva was injured when a tuna fish fell on him while he and other crew members were retrieving the *Mary Antoinette's* seine net from the sea. The net is three-fifths of a mile in length and six hundred feet wide. As a school of captured tuna is being loaded into storage wells on the boat, a motorized pulley (the "power block") lifts the net out of the sea and compresses its six hundred feet in width to three or four feet. As the compressed net comes out of the power block, crew members fold it into stacks on the stern of the boat. Oftentimes fish, sharks and porpoise become entangled in the net and, as occurred here, fall on crew members working below the power block.

On the day the accident occurred, the *Mary Antoinette* had put its seine net in the water an hour before sunset and Da Silva was injured while stacking it below the power block. At trial Da Silva argued that it was unlawful to start fishing that late in the day. He relied upon a former National Marine Fisheries Service (NMFS) regulation (50 C.F.R. § 216.24(d)(2)(vii)(G)) which prohibited release of seine nets within an hour and a half of sunset.[2] The trial court, however, instructed the jury that so-called "sundown sets" were permissible at the time Da Silva was injured. The trial court relied upon a notice placed in the Federal Register by the NMFS on January 8, 1981. The notice stated: "The Final Decision contained a prohibition on sundown sets which became effective on January 1, 1981. However, because of new information regarding the effects of this prohibition and the potential of the U.S. Fleet to develop means of reducing sundown [porpoise] mortalities, the National Marine Fisheries Service is reconsidering the appropriateness of this regulation. . . .In light of its review of the sundown prohibition, the agency has determined that it will undertake no enforcement action for alleged violations of this prohibition." (46 Fed.Reg. 2153).

On appeal Da Silva argues the notice did not rescind the regulation and that the *Mary Antoinette* was engaged in unlawful activity, even though the vessel was not subject to any enforcement action by the NMFS. He contends the trial court's instruction prevented him from establishing the defendant's negligence per se[3] and recovering punitive damages.

Because the jury found the defendants liable for breach of the warranty of seaworthiness, any instruction which impaired Da Silva's negligence claim was harmless. (See *Kramer* v. *Ferguson* (1964) 230 Cal.App.2d 237, 246 [41 Cal.Rptr. 61]; 9 Witkin, Cal. Procedure (3d ed. 1985) § 349.) Thus we do not need to consider directly whether, as Da Silva contends, the unenforced regulation gave rise to application of the doctrine of negligence per se. (See *Agricultural Labor Relations Bd.* v. *Laflin & Laflin* (1979) 89 Cal.App.3d 651, 662-663, fn. 11 [152 Cal.Rptr. 800].) However, because of the regulation's potential impact on Da Silva's claim for punitive damages, we must nonetheless consider the propriety of its use in a civil proceeding.

■ Use of a safety regulation in collateral civil proceedings may be expressly limited by the legislative branch. (*Spencer* v. *G. A. MacDonald Constr. Co.* (1976) 63 Cal.App.3d 836, 857 [134 Cal.Rptr. 78]; *Kopczynski*

---

[2] As of July 1, 1986, the prohibition was deleted by the NMFS. (51 Fed.Reg. 197, Table 1.)

[3] The defendants have agreed that a Jones Act plaintiff does not have to demonstrate that a regulation was meant to protect him in order to rely upon the doctrine of negligence per se. (See *Kernan* v. *American Dredging Co.* (1958) 355 U.S. 426, 435 [2 L.Ed.2d 382, 390, 78 S.Ct. 394, 399]; but see *Kopczynski* v. *The Jacqueline* (9th Cir. 1984) 742 F.2d 555, 558-559.)

v. *The Jacqueline, supra,* 742 F.2d 555, 558-559, cert. den. 471 U.S. 1136 [86 L.Ed.2d 696, 105 S.Ct. 2677].) In *Spencer,* a statute prevented use of occupational safety regulations in an action between injured persons and nonemployer defendants; in *Kopczynski,* a statute prevented use of federal occupational safety regulations in a seaman's personal injury action.

Substantive defects in a particular regulation may also affect its use as a standard of care in a civil action for damages. (See *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 374-375 [125 P.2d 482, 147 A.L.R. 515]; *Olsen* v. *McGillicuddy* (1971) 15 Cal.App.3d 897, 900-901 [93 Cal.Rptr. 530]; *Holman* v. *Viko* (1958) 161 Cal.App.2d 87, 93-94 [326 P.2d 551].) In each of those cases the trial court was asked to instruct the jury on a local safety ordinance; in each case the reviewing court held that the propriety of the proposed instruction depended upon whether the local ordinance was preempted by state law. (*Pipoly* v. *Benson, supra,* at p. 375 [local pedestrian ordinance preempted, instruction improper]; *Olsen* v. *McGillicuddy, supra,* 15 Cal.App.3d at pp. 900-901 [no preemption of local gun ordinance, error to refuse instruction]; *Holman* v. *Viko, supra,* 161 Cal.App.2d at pp. 93-94 [same as *Pipoly*].) The holdings in these cases make it clear that preemption, which invalidates the substance of local regulations, also prevents use of the regulations as a standard of care.

However, where the bar to enforcement of a particular regulation is unrelated to the standard of care it creates, collateral use of the regulation is appropriate. In *Clinkscales* v. *Carver* (1943) 22 Cal.2d 72 [136 P.2d 777], the court upheld application of the negligence per se doctrine even though criminal liability was barred by a defect in publication of the ordinance in question. In explaining that the defendant, who had ignored a posted stop sign, was subject nonetheless to a negligence per se instruction the *Clinkscales* court said: "Even if the conduct cannot be punished criminally because of irregularities in the adoption of the prohibitory provisions, the legislative standard may nevertheless apply if it is an appropriate measure for the defendant's conduct." (*Id.* at p. 75.)

In this case the NMFS' suspension of enforcement was related directly to the substantive propriety of the regulation. Indeed by its terms, the suspension of enforcement was caused by the NMFS's "reconsideration of the appropriateness of the regulation." (46 Fed.Reg. 2153.) Under these circumstances violation of the regulation would not support a finding of "the conscious disregard for the safety of others" which is necessary for punitive damages. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895, 898-899 [157 Cal.Rptr. 693, 598 P.2d 854]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 808-809 [174 Cal.Rptr. 348]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 32 [122 Cal.Rptr. 218].)

Moreover, the regulation would not support Da Silva's theory that the respondents covered up his injury in order to avoid detection by the NMFS. Plainly, in the eyes of the NMFS, there was nothing to conceal.

Because the sundown set prohibition was not a proper standard for measuring the defendants' conduct, the court acted properly in rejecting Da Silva's theory of liability. Admittedly, since at the time of the accident the prohibition had not yet been repealed, it was inaccurate to go further and instruct the jury that sundown sets were "permissible." Ideally, the jury should have been instructed that, in light of the suspension, they could not consider the regulation in their deliberations. The trial court's inaccuracy, however, did not prejudice Da Silva. Before advising the jury about its legal conclusion, the trial court explained the existence of the regulation and the notice suspending enforcement. In this context any distinction between the trial court's instruction and one which would have told the jury to ignore the prohibition is largely academic and does not warrant reversal. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770-771 [206 Cal.Rptr. 354, 686 P.2d 1158].)

### B. Maintenance and Cure

"The Seaman's right to maintenance dates back to the Middle Ages. [Citation.] 'Maintenance' is the duty of a shipowner to provide food and lodging to a seaman who falls ill or becomes injured while in the service of the ship. [Citation.] The right to maintenance is tied to the right to cure, i.e. necessary medical services, and both extend to the point of 'maximum recovery.' [Citation.] In addition, a seaman is entitled to recover unearned wages. [Citations.] ▪ In sum, the elements of the common law maintenance and cure action included a living allowance during the recovery period (maintenance), reimbursement for medical expenses (cure), and unearned wages for the period from the onset of injury or illness until the end of the voyage. [Citation.]" (*Gardiner* v. *Sea-Land Service, Inc.* (9th Cir. 1986) 786 F.2d 943, 945-946, cert. den. 479 U.S. 924 [93 L.Ed.2d 303, 107 S.Ct. 331].)

Under the terms of the union contract which governed Da Silva's employment, the *Mary Antoinette* was obligated to pay him $12 a day in "maintenance" until he was finished convalescing from his injuries. ▪ At trial Da Silva argued that the rate of maintenance set forth in the contract was unreasonable and that the jury should have been instructed to award Da Silva maintenance at a daily rate sufficient to meet Da Silva's daily cost of living. The trial court rejected Da Silva's argument and instructed the jury to award Da Silva maintenance at the $12 rate.

The trial court's resolution of this issue is supported by the decision in *Gardiner* v. *Sea-Land Service, Inc., supra,* 786 F.2d 943. There the court said: "[T]he parties to the agreement included the traditional right to maintenance as a subject of the negotiating process. The resulting collective bargaining agreement incorporated an explicit rate of maintenance as one of its terms. We cannot fairly say that this rate, as a consequence of the normal 'give and take' process of collective bargaining, is not entitled to the same reliability accorded to other terms and conditions within the same agreement. The national labor policy of promoting and encouraging collective bargaining agreements would be unduly compromised were we to conclude otherwise." (*Id.* at p. 949.)

We agree with the rationale expressed by the majority in *Gardiner*.[4] Thus, the trial court acted properly in instructing the jury to award Da Silva his rights under the contract.

II

COUNSEL'S CONDUCT

At the close of defense counsel's argument, Da Silva's counsel approached the bench and complained that his opponent had acted improperly in displaying to the jury medical records which disclosed Da Silva's application for social security benefits. However Da Silva's counsel refused any curative instruction. Upon further inquiry by the trial court, Da Silva's counsel expressly declined to move for a mistrial. ■ It is well established that "[o]nly misconduct so prejudicial that an admonishment would be ineffective excuses the failure to request such admonishment." (*Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 892 [112 Cal.Rptr. 540, 519 P.2d 588]; *Hoffman* v. *Brandt* (1966) 65 Cal.2d 549 [55 Cal.Rptr. 417, 421 P.2d 425].)

■ In this case the trial court, in denying Da Silva's motion for a new trial, impliedly found Da Silva was not prejudiced by counsel's reference to a collateral source of compensation. (*Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d at p. 794.) The trial court's determination of prejudice may not be disturbed unless it is patently wrong. (*Ibid.; Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 72 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d

---

[4] Da Silva's contentions to the contrary are not supported by any valid authority. *Rutherford* v. *Sea-Land Service, Inc.* (N.D. Cal. 1983) 575 F.Supp. 1365, upon which he relies, was specifically disapproved by the *Gardiner* court (*Gardiner, supra,* 786 F.2d at pp. 945-946); *Cortes* v. *Baltimore Insular Line* (1932) 287 U.S. 367 [77 L.Ed. 368, 53 S.Ct. 173] predates the existence of the national labor policy upon which the *Gardiner* court relied; the plaintiff in *Incandela* v. *American Dredging Co.* (2d Cir. 1981) 659 F.2d 11 was not working under a union contract when injured.

1059]; *Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667].) In this case the trial court's implied finding is supported by the $17,000 award for medical expenses, which suggests the jury ignored potential collateral sources with respect to that element of damages. Thus the trial court's finding cannot be characterized as a patent error. Given that finding, Da Silva cannot establish the extraordinary prejudice needed in light of his failure to seek a curative instruction. (See *Whitfield* v. *Roth, supra,* 10 Cal.3d at p. 892; *Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d at p. 72.)

## III

### DAMAGES

A.   Compensatory Damages for Da Silva's Injuries

At trial the defendants vigorously disputed Da Silva's claim that the injuries he suffered in the accident—in particular, damage to his left shoulder—ended his career as a fisherman. In support of their theory, the defendants presented testimony from an ear, nose and throat specialist, a neurologist and an orthopedic surgeon. Those medical experts testified that the injuries Da Silva suffered in the accident would not keep him from fishing. The defense also presented evidence which suggested that any injury to Da Silva's shoulder preceded the accident aboard the *Mary Antoinette*. In addition to medical experts, the defendant's called an economic expert and a rehabilitation expert. The economist testified that the future of the tuna industry was uncertain; the rehabilitation therapist testified that Da Silva could be retrained in a land-based occupation and earn more than his probable wage as a tuna fisherman.

■ Nonetheless on appeal Da Silva contends the $78,500 in compensatory damages he received is inadequate as a matter of law. He argues that the compensatory award does not provide him any future lost earnings as tuna fisherman and is therefore inconsistent with the $17,000 award for past and future medical cure. However, even if we accept Da Silva's argument that the award does not include future lost wages, we cannot disturb the jury's determination of damages. As the court in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183], said: ■ "In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,

which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court."

Here the jury's award of future medical cure does not necessarily infer a finding that future treatment was the result of the vessel's unseaworthiness. Indeed the jury was instructed: "A seaman is entitled to maintenance and cure even if he is unable to establish that he was injured as a result of any negligence on the part of his employer or an unseaworthy condition aboard the vessel. Generally speaking, in order to recover maintenance and cure, the plaintiff need only show that he suffered injury or illness while in the service of the vessel on which he was employed as a seaman, without willful misbehavior on his part."

In light of evidence that Da Silva's left shoulder was injured before the October 1983 accident and was being treated at the time of trial, the jury could have found the vessel liable for future treatment of the shoulder under the maintenance and cure warranty without finding that the injury was caused by the vessel's unseaworthiness. The jury could also have found that Da Silva's injuries, while necessitating future treatment, would not interfere with a more profitable land-based occupation. If the jury reached either of these conclusions, no award of damages for future lost earnings would be appropriate. Since each of these conclusions is supported by substantial evidence in the record, we cannot disturb the jury's verdict. (*Crawford* v. *Southern Pacific Co., supra,* 3 Cal.2d at p. 429; *Lemere* v. *Safeway Stores, Inc.* (1951) 102 Cal.App.2d 712, 715 [228 P.2d 296]; *Gersick* v. *Shilling* (1950) 97 Cal.App.2d 641, 648-649 [218 P.2d 583].)

## B. Pain and Suffering

In their briefs, Da Silva's counsel state that the jury "appears to have awarded DA SILVA nothing for pain and suffering." This statement is mystifying. Under Da Silva's own interpretation of the verdict, the jury awarded him lost wages at rate of $28,000 a year for the 23 months between the accident and the date the verdict was entered. This leaves $22,500 of the verdict which can be attributed to pain and suffering.[5] Needless to say, such an award for pain and suffering is not inadequate as a matter of law. In this

---

[5] Our obligation is to indulge every reasonable inference which would support the verdict rather than impeach it. (*Crawford, supra,* 3 Cal.2d at p. 429.) We are not required to speculate about whether the $22,500 available for pain and suffering under Da Silva's apportionment of the verdict should itself be reduced by the $15,000 in retraining suggested by defense counsel in his final argument. The jury was not instructed specifically to include retraining in its consideration of damages and the special verdict form does not make any reference to retraining.

regard we note that, as the Supreme Court said in *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506 [15 Cal.Rptr. 161, 364 P.2d 337]: "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]."

Here, where there was conflicting evidence as to the seriousness, severity and cause of Da Silva's injuries, we cannot set aside the jury's damage award. (*Lemere* v. *Safeway Stores, Inc., supra,* 102 Cal.App.2d at p. 715.)

### C.  Loss of Consortium

Mrs. Da Silva testified that her husband had been at home since the accident occurred. She explained that as a result of his injuries he was flat on his back for five weeks, that at the time of trial he was experiencing a hearing loss which made it difficult to communicate with him and that he no longer enjoyed dancing.

However, Mrs. Da Silva conceded that during her 20 years of marriage, her husband's fishing trips usually lasted two to three months and that the interval between trips was usually two or three weeks. She also testified that, but for his injuries, her husband would have returned to his career as a fisherman. Given the unique circumstances created by Mr. Da Silva's occupation, the jury could reasonably conclude that Mrs. Da Silva did not lose any of the society, comfort and companionship she would have otherwise expected from her husband. Thus we cannot set aside the jury's determination that she did not suffer any net loss of consortium. (*Crawford* v. *Southern Pacific Co., supra,* 3 Cal.2d at p. 429.)

These facts are somewhat different from the situation presented in *Smith* v. *Covell* (1980) 100 Cal.App.3d 947 [161 Cal.Rptr. 377], where the jury refused to award the spouse of an injured plaintiff any damages although liability was found and damages awarded to the plaintiff. Unlike the lifestyle described by Mrs. Da Silva, in *Smith* there was no reference to an occupation which, in the eyes of a jury, could diminish substantially a spouse's expected level of consortium. Thus, unrestrained by the unique facts presented in this record, the court in *Smith* was free to set aside the jury's verdict as inadequate. In light of Mrs. Da Silva's testimony, we do not have that liberty.

## IV*

### SANCTIONS

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Judgment affirmed.

Wiener, Acting P. J., and Butler, J., concurred.

---

* See footnote 1, *ante,* page 1.